CITY OF DALLAS, Appellant,

v.

Nakita BROOKS & Simian Brooks, individually and as Representatives of the Estate of Patricia Brooks, Deceased, Appellees.

No. 05–10–00692–CV.

Court of Appeals of Texas, Dallas.

Aug. 30, 2011.

Patricia M. Medrano, Barbara E. Rosenberg, City of Dallas Attorney's Office, Dallas, TX, for Appellant.

Michael Hindman, Rolle, Breeland, Ryan & Landau, Wingler & Hindman, Dallas, TX, for Appellee.

Before Justices MOSELEY, BRIDGES, and O'NEILL.

## OPINION

Opinion By Justice MOSELEY.

Nakita and Simian Brooks, individually and as representatives of the Estate of Patricia Brooks, Deceased, sued the City of Dallas and Juan Rangel, a Dallas police officer. The Brookses alleged Rangel's negligent use of a motor vehicle caused the death of their mother, Patricia Brooks, a pedestrian who was struck and killed by a police car driven by Rangel. After Rangel was nonsuited,[1] the City filed a plea to the jurisdiction asserting it was entitled to immunity from suit because Rangel was entitled to official immunity. The trial court denied the City's plea.

The City filed this interlocutory appeal. In a single issue, it contends the trial court erred in denying its plea to the jurisdiction. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(5) (West 2008). For the reasons set out below, we reverse the trial court's order denying the City's plea and dismiss this case for lack of jurisdiction.

## I. BACKGROUND

Rangel, a Dallas police officer since 2003, testified by affidavit that on the day of the incident (June 3, 2006) he was working patrol as assigned with another officer. About 9:00 p.m., as they were traveling on South Fitzhugh Avenue, they received a call from a police officer requesting police cover/backup for a combative, suicidal person in the 5200 block of South Lamar. Rangel said the call was a "Code 1 call for cover," referring to the Dallas Police Department's General Orders concerning the operation of emergency vehicles. Still on Fitzhugh, Rangel notified the police dispatcher that they were en route to provide backup at the requested location, which was less than three miles away.

Rangel was familiar with the area, having patrolled it for the previous two years. He had "a good understanding of the streets and intersections." Rangel turned left onto the southbound side of Robert B. Cullum Boulevard, a divided road with three lanes in each direction. He was traveling in the 2400 block of Cullum, which is a "predominantly industrial area" with warehouses on both sides of the road; there was normally no pedestrian traffic in the late evening. No other vehicles were traveling on the roadway, and Rangel did

---

1. The City filed a motion to dismiss Rangel pursuant to section 101.106(e) of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.106(e) (West 2011). The record indicates the trial court granted this motion and dismissed Rangel, but such order is not included in the record on appeal. The City's brief says that Rangel was "non-suited" pursuant to section 101.106(e). The Brookses do not contradict that statement.

not see any pedestrians in the area. The posted speed limit on Cullum was thirty-five miles per hour. Rangel increased his speed to fifty miles per hour on Cullum.

About .3 miles from the intersection of Fitzhugh and Cullum, Rangel's squad car struck Brooks, a pedestrian, in the middle lane of southbound Cullum. Brooks, an African American woman, was wearing a black t-shirt and dark jeans and was not in a crosswalk. Rangel said he did not see her until she was in his lane of traffic; when he did see her, he "took evasive action" by turning the steering wheel and blowing his horn, but he hit her. Brooks died from her injuries.

The Brookses' original petition alleged Rangel was negligent by (quoting):

> a. Failing to travel with emergency lights or siren on;
>
> b. Traveling at a speed in excess of that which was required to cover another officer;
>
> c. Failing to maintain such lookout as a person of ordinary prudence would have maintained under the same or similar circumstances;
>
> d. Driving inattentively;
>
> e. Failing to take proper evasive measures to avoid the incident[.]

The City filed a plea to the jurisdiction, relying on Rangel's affidavit and contending it established all elements of the official immunity defense.

The Brookses filed a response and a supplemental response to the plea, arguing the City had failed to prove conclusively that Rangel was entitled to official immu-

nity because: (1) there was a fact issue whether his actions were discretionary, and (2) they produced evidence conclusively establishing he was not acting in good faith. They supported their responses with evidence, including the Dallas Police Department's General Orders regarding emergency vehicle operation.[2] The essence of their argument is that the General Orders did not allow Rangel to speed without using emergency warning devices, that is, lights and sirens, establishing a lack of discretion and good faith.

The City filed a reply to the Brookses' response and supported it with additional evidence. Following two hearings, the trial court denied the City's plea. In a single issue, the City contends Rangel's official immunity—and thus its governmental immunity—was conclusively established by the evidence. Consequently, the City argues it is entitled to reversal of the trial court's order denying its plea and dismissal for want of jurisdiction.

## II. APPLICABLE LAW

Sovereign immunity, governmental immunity, and official immunity are separate—but related—matters. *Sovereign immunity* is a common-law doctrine of the courts. *LTTS Charter Sch., Inc. v. C2 Constr., Inc.*, 342 S.W.3d 73, 89 (Tex. 2011) (Guzman, J., dissenting) (citing *Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex.2006)).[3] It refers to the State's immunity from liability and from suit. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n. 3 (Tex.2003). Sovereign immunity protects the State as well as its "various provisions of state govern-

---

**2.** General Orders 300.00 ("Operations") including General Orders 301.00 through .110 ("Emergency Vehicle Operation") are in the record on appeal.

**3.** "In this Court's second Term, we acknowledged the common-law rule that 'no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent.' " *Tooke,* 197 S.W.3d at 331 (quoting *Hosner v. DeYoung,* 1 Tex. 764, 769 (1847)).

ment, including agencies, boards, hospitals, and universities." *Id.*

■ Sovereign immunity—under the name of *governmental immunity*—also extends to political subdivisions of the State, including cities. *See Reata Constr. Corp. v. City of Dallas,* 197 S.W.3d 371, 374 (Tex.2006). For cities, however, governmental immunity only applies to actions taken in the performance of its governmental functions, not from actions taken in its proprietary function. *See Tooke,* 197 S.W.3d at 343; *City of Tyler v. Likes,* 962 S.W.2d 489, 501 (Tex.1997); *City of Plano v. Homoky,* 294 S.W.3d 809, 813 (Tex.App.-Dallas 2009, no pet.). One such governmental function is the provision of police protection. Tex. Civ. Prac. & Rem.Code Ann. § 101.0215(a)(1) (West 2011). In Texas, both sovereign and governmental immunity deprive a trial court of subject matter jurisdiction. *See Harris Cnty. v. Sykes,* 136 S.W.3d 635, 638 (Tex.2004).

■ *Official immunity* protects government employees from personal liability. *Univ. of Houston v. Clark,* 38 S.W.3d 578, 580 (Tex.2000). A governmental employee is entitled to official immunity: (1) for the performance of discretionary duties; (2) within the scope of the employee's authority; (3) provided the employee acts in good faith. *Id.* Official immunity is an affirmative defense; thus the defendant has the burden to establish all of its elements. *Id.*

■ The legislature has enacted a limited waiver of sovereign immunity. A governmental unit (including a city acting in its governmental capacity) may be liable for, among other things, the wrongful act or omission or negligence of an employee arising from the operation or use of motor-driven vehicles or equipment if the "employee would be personally liable to the claimant according to Texas law." *See* Tex. Civ. Prac. & Rem.Code Ann. § 101.021(1)(B) (West 2011).[4] If a governmental employee is entitled to official immunity, however, he would not be "personally liable . . . according to Texas law," and the statute does not waive the sovereign or governmental immunity of his employer. In other words, if official immunity shields a governmental employee from liability, his governmental employer remains immune from vicarious liability for his actions. *See Clark,* 38 S.W.3d at 580 (citing *DeWitt v. Harris Cnty.,* 904 S.W.2d 650, 653 (Tex. 1995)); Tex. Civ. Prac. & Rem.Code Ann. § 101.021.

## III. STANDARD OF REVIEW

■ Where, as here, the City's plea challenges the existence of jurisdictional facts, the trial court must review the relevant evidence to determine whether a fact issue exists. *Univ. of Tex. at Austin v. Hayes,* 327 S.W.3d 113, 116 (Tex.2010) (per curiam) (citing *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004)).[5] After a governmental entity

---

4. *See also* Tex. Civ. Prac. & Rem.Code Ann. § 101.025 (West 2011) (entitled "Waiver of Governmental Immunity; Permission to Sue"). Section 101.025 provides in its entirety (quoting):

 (a) Sovereign immunity to suit is waived and abolished to the extent of liability created by this chapter.

 (b) A person having a claim under this chapter may sue a governmental unit for damages allowed by this chapter.

5. When a plea to the jurisdiction challenges the pleadings, the trial court looks to whether the plaintiff has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the case. *Miranda,* 133 S.W.3d at 226; *City of Dallas v. Heard,* 252 S.W.3d 98, 102 (Tex. App.-Dallas 2008, pet. denied). The court liberally construes the plaintiff's pleadings in favor of jurisdiction, and looks to the plaintiff's intent, accepting as true the facts alleged. *Miranda,* 133 S.W.3d at 226, 228.

presents evidence that the trial court lacks subject matter jurisdiction, the plaintiff must show there is a disputed material fact regarding the jurisdictional issue. *See Miranda*, 133 S.W.3d at 228. If the evidence raises a fact question on jurisdiction, the trial court cannot grant the plea, and the issue must be resolved by the trier of fact. *Hayes*, 327 S.W.3d at 116. On the other hand, if the evidence is undisputed or fails to raise a fact question, the trial court must rule on the plea as a matter of law. *Id.*[6]

We review de novo a challenge to the trial court's subject matter jurisdiction. *Miranda*, 133 S.W.3d at 226; *Homoky*, 294 S.W.3d at 812.

## IV. DISCUSSION

The City asserts it conclusively proved each element of Rangel's official immunity affirmative defense, thus preserving its immunity from suit. We consider each element of official immunity in light of the City's and the Brookses' arguments and evidence.

### A. Performing Discretionary Duties

#### 1. Applicable Law

Ministerial acts are those where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex.1994). Actions requiring obedience to orders or the performance of a duty to which the actor has no choice are ministerial. *Id.* But if an action involves personal deliberation, decision, or judgment, it is discretionary and not "merely ministerial." *Id.* If a government employee is performing a discretionary function,

then he is protected by official immunity, regardless of whether he was negligent in the exercise of his public duties. *See id.* at 653; *Harless v. Niles*, 100 S.W.3d 390, 396 (Tex.App.-San Antonio 2002, no pet.).

The distinction between ministerial and discretionary acts is often one of degree because any official act that is ministerial still requires the employee to use some discretion in its performance. *Harless*, 100 S.W.3d at 396 (citing *Deaver v. Bridges*, 47 S.W.3d 549, 553 (Tex.App.-San Antonio 2000, no pet.)). Thus, an officer driving a motor vehicle while on official, non-emergency business is performing a ministerial act. *Woods v. Moody*, 933 S.W.2d 306, 308 (Tex.App.-Houston [14th Dist.] 1996, no writ). However, in some situations an officer's operation of a vehicle involves personal deliberation or the exercise of professional expertise, decision, or judgment. Such situations include, but are not limited to, high-speed chases, investigations, and traffic stops. *See Harless*, 100 S.W.3d at 397 (discretionary duties include operating a patrol car in emergency situations, such as a high speed chase, an investigation, or a traffic stop— as opposed to non-emergency situations— because these actions involve police officer's personal deliberation or the exercise of professional expertise, decision, or judgment); *see also Chambers*, 883 S.W.2d at 655 (high-speed chase); *Woods*, 933 S.W.2d at 308 (citing cases as examples of proposition).

#### 2. Discussion

The City argues the evidence conclusively established that Rangel was performing a discretionary function when he decided to respond to a Code 1 call from another police officer requesting backup

---

6. This standard generally mirrors our summary judgment standard under Texas Rule of Civil Procedure 166a(c). *See Miranda,* 133 S.W.3d at 228.

for a combative, suicidal person. The City relied on Rangel's affidavit, in which he said he was assigned to the southeast patrol division and working patrol when he received the Code 1 call for cover from a police officer. He said:

> Due to my law enforcement experience and responding to emergency calls, I understand that "calls for cover" or back-up involving a combative or suicidal person need to be responded to immediately because a fellow officer could be in imminent danger and the immediate presence of other police officers is necessary to prevent serious injury to the police officer and/or prevent the combative suicidal person from injuring himself. . . .

On appeal, the Brookses refer to the police department's General Orders, which mandated "the circumstances and methods under which an officer must respond to an emergency." In a significant portion of their brief, they assert the General Orders prove Rangel had no discretion to respond to the call as he did, and therefore was not performing "discretionary duties" when the accident occurred.

Although we consider the General Orders in more detail below in connection with whether Rangel was acting in "good faith" when he responded to the call for backup, we consider here two specific General Orders the Brookses rely on to support their argument that Rangel was not performing a discretionary function. First, General Order 301.03 is titled "Levels of Response Defined" and provides for two levels of responses:

A. Code 1—The operation of an emergency vehicle *in normal traffic without using emergency lights and siren.* All departmental personnel operating emergency vehicles in this mode will *proceed with the nor-mal traffic flow and obey all traffic control devices and signals.*

B. Code 3—The operation of an emergency vehicle using the emergency warning devices, as well as activating the emergency vehicle's headlights. This method of operation is authorized by the State Motor Vehicle Code and is outlined in general order 301.05.

(Emphasis added.) Second, General Order 301.05(B)(2) provides the authority to operate an emergency vehicle in an emergency manner in response to an "emergency," which is defined, in part, as a call or situation in which "the personal knowledge of an officer justifies the reclassification of a Code 1 assignment to an emergency level Code 3. This includes situations in which the immediate protection and/or preservation of life are a consideration in the response to be made by the officer."

The Brookses assert that these General Orders transformed Rangel's response to the request for backup from a discretionary function to a ministerial one. They argue the General Orders mandated that Rangel respond in Code 3; that Rangel could not exceed the speed limit or the "normal traffic flow" without following Code 3 procedures and using emergency warning devices; and the fact that he did so means he was violating the General Orders and performing an act that he had no discretion to perform.

We disagree. At this point in the analysis, our focus is on whether Rangel was performing a discretionary function, not on whether he had "discretion to do an allegedly wrongful act while discharging that function." *See Chambers,* 883 S.W.2d at 653; *Harless,* 100 S.W.3d at 396. Thus the proper inquiry is *whether* Rangel was operating his patrol car in an emergency situation, not *how* or in what manner he

operated his vehicle while responding. *See Harless,* 100 S.W.3d at 397.

The Brookses rely on *Brown v. Ener,* 987 S.W.2d 66, 69 (Tex.App.-Houston [14th Dist.] 1998, no pet.), in support of their argument that Rangel had "no discretion" to ignore the police department's General Orders relating to emergency vehicle operation. In that case the county constable's office policy *forbade* a deputy constable from engaging in an emergency pursuit while carrying a civilian passenger. The policy was presumed to be mandatory, and thus the deputy constable had no discretion to engage in an emergency response under such circumstances. The Brookses's additional authority, *Redd v. Hughes,* No. 05–03–00573–CV, 2003 WL 22383711, at *2 (Tex.App.-Dallas Oct. 20, 2003, no pet.) (mem. op.), falls into the same category. *Redd* concerned a city policy mandating use of rotating lights on a street sweeper when in use; absent the rotating light, the sweeper was not to be used. *Id.*

Unlike the policies in *Ener* and *Redd,* here the General Orders do not prohibit Rangel from responding to a Code 1 call for cover. Instead, pursuant to General Order 301.05(B)(2) and as the Brookses acknowledge in their brief on appeal, the General Orders left to Rangel's discretion whether to respond under Code 1 or to upgrade the response to Code 3. Further, and contrary to the Brookses' argument, a response under Code 1 did not prohibit Rangel from exceeding the posted speed limit. By the plain terms of General Order 301.03(A), an officer responding under Code 1 was required to "proceed with the normal traffic flow," not proceed at or below the posted speed limit.[7]

7. Nor does "obey[ing] all traffic control devices and signals" refer to the posted speed limit. This interpretation is supported by the wording of General Order 301.04(D), provid-

We conclude that the evidence proved as a matter of law that Rangel was performing a discretionary duty when he operated his vehicle in response to the call for backup. *See Chambers,* 883 S.W.2d at 653, 654; *Harless,* 100 S.W.3d at 396; *Woods,* 933 S.W.2d at 308. We resolve the City's issue in its favor to this extent.

### B. Acting within the Scope of Authority

 A government employee acts within the scope of his authority if he is discharging the duties generally assigned to him, even if his actions may have been wrong or negligent. *Chambers,* 883 S.W.2d at 655, 658.

 Rangel's statements in his affidavit establish that he was on duty as a patrol officer when he responded to a Code 1 call for cover from another officer requesting assistance with a combative, suicidal person. By responding to this call, Rangel was discharging the duties generally assigned to him. *See id.* Moreover, in their original petition, the Brookses conceded that Rangel was "acting within the course and scope of employment," and in their responses to the City's plea they did not challenge this element. We conclude the evidence proved as a matter of law that Rangel was acting within the scope of his authority when he responded to the call for backup. *See id.* We resolve the City's issue in its favor to this extent.

### C. Acting in Good Faith

#### 1. Applicable Law

 Texas uses an objective standard to test good faith in official immunity cases. In the context of a high-speed pur-

ing in relevant part: "Except when driven [sic] Code 3, no emergency vehicle will be *driven faster than the normal flow of traffic.*" (Emphasis added.)

suit case, an officer acts in good faith if "a reasonably prudent officer, under the same or similar circumstances, could have believed that the need to immediately apprehend the suspect outweighed a clear risk of harm to the public in continuing the pursuit." *See id.* at 656. The supreme court's opinion in *Chambers*, which involved a high-speed police pursuit, described this test as setting "an elevated standard of proof for the nonmovant seeking to defeat a claim of official immunity in response to a motion for summary judgment, while reasonably accommodating the competing interests involved." *Id.*[8]

The court in *Chambers* observed that the "could have believed" component of good faith means that

an officer must prove that a reasonably prudent officer might have believed that the pursuit should have been continued. It does not mean that an officer has to prove that it would have been unreasonable to stop the pursuit; nor must the officer prove that all reasonably prudent officers would have continued the pursuit. To controvert the officer's summary judgment proof on good faith, the plaintiff must do more than show that a reasonably prudent officer could have decided to stop the pursuit; *the plaintiff must show that "no reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts."*

*Id.* at 656–57 (quoting *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.

1993) (emphasis added) (citations and footnotes omitted)).

◼ The good-faith test requires a balancing of two competing considerations-the need of the action taken weighed against the clear risk of harm to the public in taking the action. *See Wadewitz v. Montgomery,* 951 S.W.2d 464, 467 (Tex.1997). *Wadewitz* involved a high-speed response to assist an officer on a theft in progress. In that context, the supreme court stated that "need"

is determined by factors such as the seriousness of the crime or accident to which the officer responds, whether the officer's immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect, and what alternative courses of action, if any, are available to achieve a comparable result.

*Id.* On the other hand, the "risk" aspect of good faith

refers to the countervailing public safety concerns: the nature and severity of harm that the officer's actions could cause (including injuries to bystanders as well as the possibility that an accident would prevent the officer from reaching the scene of the emergency), the likelihood that any harm would occur, and whether any risk of harm would be clear to a reasonably prudent officer.

*Id.*

◼ Stating the good-faith test in the context of the facts of this case, we conclude that in order to prove Rangel

---

8. "On one hand, there is
 (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; [and] (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.

*Scheuer v. Rhodes,* 416 U.S. 232, 240, 94 S.Ct. 1683, 1688, 40 L.Ed.2d 90 (1974). On the other hand, the court must consider the rights of bystanders or other innocent parties if an officer acts in gross disregard of public safety."

*Chambers,* 883 S.W.2d at 656.

acted in good faith, the City had to prove that a reasonably prudent officer, under the same or similar circumstances, could have believed that the need to respond to the call for backup in the manner in which Rangel responded outweighed a clear risk of harm to the public in doing so. *See id.* at 466 (citing *Chambers*, 883 S.W.2d at 656). The City need not prove that it would have been unreasonable to take a different action; neither must it prove that all reasonably prudent police officers would have made the same decision. *See Chambers*, 883 S.W.2d at 657. And evidence of negligence alone will not controvert competent evidence of good faith. *See Wadewitz*, 951 S.W.2d at 467 n. 1.

The evidence concerning good faith must address "what a reasonable officer could have believed under the circumstances, and must be substantiated with facts showing that the officer assessed both the need to apprehend the suspect and the risk of harm to the public." *Clark*, 38 S.W.3d at 581 (citing *Wadewitz*, 951 S.W.2d at 467). Further, "conclusory statements that a reasonable officer could or could not have taken some action will neither establish good faith on summary judgment nor raise a fact issue to defeat summary judgment." *Id.* An expert's opinion testimony may establish good faith, even if the expert is an interested witness, as long as the testimony is more than mere conclusory statements. *See Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999).

## 2. The City's Evidence

By way of summary,[9] Rangel's affidavit addressed the "need" for his actions in responding to the call for backup by discussing the danger of a combative, suicidal person to himself, to the officer needing assistance, and to the public. Rangel's affidavit also addressed the "risks" involved in his response by discussing public safety concerns: he acknowledged there was "some risk" involved when an officer "makes a decision to increase his speed while proceeding to a Code 1 call." However, the likelihood was "minimal" given the nature of the road and the road conditions, the lack of traffic in either direction,

9. In his affidavit, Rangel said, in relevant part:

When I increased my speed to 50 miles per hour, I believed in good faith that the need to get to the officer who requested cover outweighed the perceived minimal risk of an accident. I recognized that there was some risk when an officer makes a decision to increase his speed while proceeding to a Code 1 call. But, given that Robert B. Cullum is a relatively straight road, the dry condition of the road at the time, and no other vehicles traveling on the roadway, and my experience of there being no pedestrian traffic in the late evening in that area, I did not perceive that increasing my speed on Robert B. Cullum Boulevard would cause any danger to any other driver or bystander close to my location. The potential danger posed by increasing my speed to 50 miles per hour was far less, considering the above factors, than the danger posed by the combative, suicidal person, given the danger he posed to himself, to the police officer requesting cover, and to other people around him. Being that the police officer calling for cover or back-up required immediate assistance and was expecting us to provide police cover or back up, there was no other reasonable alternative but proceed to the location in the manner in which I proceeded.

From my point of view at the time, and at all times while in en route [sic] to the call, I did not engage in conduct I believed would pose a likelihood of serious injury to anyone. I was acting in good faith and within the scope of my discretionary authority as a police officer. I made no decisions based on any information which I believed to be incorrect or incomplete, and I would not have done so. My actions were reasonable in light of the circumstances and any reasonably prudent officer, under the same or similar circumstances, could have believed that my actions were justified.

and his knowledge of the general lack of pedestrian traffic in that area at that time of night. He said both that "from his point of view" he did not engage in conduct he believed would pose a likelihood of serious injury to anyone and that he believed "any reasonably prudent officer, under the same or similar circumstances, could have believed that my actions were justified."

As additional proof, the City submitted the deposition testimony of Eddie Stone, a retired police detective with thirty-five years' experience with the Dallas Police Department, to establish that a reasonably prudent officer could have believed that, under the circumstances, exceeding the speed limit by fifteen miles per hour without lights and sirens was justified. Stone also testified he went to Cullum "[a]nd the flow of traffic is consistently closer to 45."

The City's evidence also included the deposition of Dallas police officer Kevin Navarro, a City of Dallas senior corporal and lead instructor at the Dallas Police Academy, who said, "In the city of Dallas, the normal flow of traffic on a regular basis tends to be above the speed limit. It's a fact.... And so when we are traveling in a Code 1 situation just in routine patrol, officers will at times go over the speed limit based on the fact they're moving at the normal flow of traffic." [10]

We conclude the City met its burden to present evidence that a reasonably prudent officer, under the same or similar circumstances, could have believed that the action Rangel took was justified. *See Chambers*, 883 S.W.2d at 656–57. We next address whether the Brookses controvert-

ed that proof. *See id.* at 657; *Miranda*, 133 S.W.3d at 228.

### 3. The Brookses' Evidence

To controvert the City's proof that Rangel acted in good faith, the Brookses had to present evidence "that no reasonable person in [Rangel's] position could have thought the facts were such that they justified [Rangel's] actions." *See Chambers*, 883 S.W.2d at 657. The gist of the Brookses' argument is that the General Orders provide that controverting evidence. It is here that we address the City's General Orders in more detail.

General Order 301.01 provides:

A. The purpose of this General Order is to describe the authority and to establish guidelines for operating emergency vehicles. It is intended as a broad guide to the application of these procedures during the operation of an emergency vehicle.

B. Situations exist that require officers to respond quickly to life threatening emergencies and/or engage in pursuit of violators. In any situation, an officer must always base the decision to pursue on probable cause, known facts, and circumstances that can be articulated by the officer.

General Order 301.03, discussed previously, is titled "Levels of Response Defined" and describes responses as either Code 1 or Code 3.

General Order 301.04(A) provides as follows:

Section 301.04. Operation of Authorized Emergency Vehicles.

10. In deposition, Navarro was asked: "When an officer decides they need to suddenly accelerate their speed in order-not because that's the normal flow of traffic, but in order to respond to a call from another officer, does this section of the general orders [referring to

General Order 301.04(A)] not make it perfectly clear that they many not accelerate their speed above the speed limit without first making a request or communicating with dispatch to that effect"? Navarro replied, "Okay. I would say it doesn't say that exactly."

A. In all operations of emergency vehicles, situations will exist which, in the responding officer's opinion, need an immediate and effective response. In these situations, the responding officer may determine that a delay in response could jeopardize the life of a citizen or officer and upgrade from a Code 1 to a Code 3 response. *When upgrading a response, the responding officer will notify the dispatcher, and upon acknowledgment, immediately activate the emergency equipment and headlights.*

(Emphasis added.) Sections 301.04(B) through (F) relate to operation of an emergency vehicle under Code 3. Section 301.04(D) provides in relevant part: "Except when driven [sic] Code 3, no emergency vehicle will be *driven faster than the normal flow of traffic.*" (Emphasis added.)

Section 301.05 is titled "Authority to Operate as an Emergency Vehicle." It provides in part:

A. The State Motor Vehicle Code permits authorized emergency vehicles to be operated an emergency manner in response to an emergency call and in immediate pursuit of an actual or suspected violator of the law.

B. The following will be considered emergencies within the meaning of Section A above:

1. Calls assigned by the radio dispatcher that are designated as emergencies and only when dispatched as emergencies by the designation "Code 3."

2. *Calls or situations wherein the personal knowledge of an officer justifies the reclassification of a Code 1 assignment to an emergency level Code 3. This includes situations in which the immediate protection and/or preservation of life are a consideration in the response to be made by the officer.*

3. Situations wherein a supervisor directs that response be made Code 3.

. . . .

(Emphasis added.)

The Brookses also argue that other deposition testimony controverts the City's proof that Rangel was operating his vehicle in good faith at the time of the accident. They point to portions of Stone's and Navarro's depositions, and to the deposition testimony of Floyd Burke, another Dallas police officer.

**4. Analysis**

The Brookses assert the evidence that Rangel operated his vehicle above the speed limit without activating his emergency lights and siren constitutes evidence that he violated the General Orders, either by responding under Code 1 but exceeding the speed limit or by "effectively operating" under Code 3 (by exceeding the speed limit) but not activating his emergency warning devices. Thus, they assert there is some evidence that Rangel was not acting in good faith when he responded to the call for backup. We disagree.

Whether Rangel in fact operated his police car in violation of the General Orders may be a factor in determining negligence, but evidence of negligence alone is insufficient to controvert competent evidence of good faith:

As we explained in *Chambers,* the good faith standard is not equivalent to a general negligence test, which addresses what a reasonable person *would have done,* rather than what a reasonable officer *could have believed. Chambers,* 883 S.W.2d at 661 n. 5. Evidence of negli-

gence alone will not controvert competent evidence of good faith.

*Wadewitz*, 951 S.W.2d at 467 n. 1.[11]

As noted earlier, to controvert the City's proof that Rangel acted in good faith the Brookses had to prove that "no reasonable person in [Rangel's] position could have thought the facts were such that they justified [Rangel's] actions." *See Chambers*, 883 S.W.2d at 657. Nothing in the General Orders leads to—or even speaks on—that conclusion. By their own terms, the General Orders are a "broad guide" to the application of the City's procedures for operating emergency vehicles, including police cars. They do not speak in terms of either the "needs" or the "risks" that must be balanced in determining whether an officer is acting in good faith in order to be protected from liability by official immunity. *See Wadewitz*, 951 S.W.2d at 467 (discussing the factors involved in balancing the need/risk elements of good faith for purposes of determining official immunity).

The General Orders, as were the statutes at issue in *Chambers,*

> are not sufficiently specific so as to leave no choice to an officer in the performance of these duties. *Chambers' argument, that an officer is without discretion to drive in a manner which violates these statutorily-imposed standards of care, inexorably leads to the conclusion that an officer is not entitled to immunity if the officer is negligent.* That formulation of the standard frustrates official immunity's very function. If public officials perform their duties without negligence, they do not need immunity. The complex policy judgment

reflected by the doctrine of official immunity, if it is to mean anything, protects officers from suit even if they acted negligently.

*Chambers*, 883 S.W.2d at 655 (emphasis added).

The Brookses' argument is based on the premise that violating the General Orders is as a matter of law never justified, and thus is something that no reasonable officer could have believed was justified. Leaving aside whether the evidence shows that Rangel in fact violated the General Orders, this premise assumes an answer (in the negative) to the very question at issue: whether a reasonable officer in Rangel's position could have believed his actions were justified. In doing so it relegates to irrelevance the needs/risks balance that is the essence of the issue of good faith. If violating the General Orders is never justified, then there is no need to consider the circumstances as they existed when Rangel answered the call for backup.

■ The Brookses also argue that other deposition testimony constitutes evidence raising at least a question of whether Rangel was operating his vehicle in good faith at the time of the accident. They assert the deposition of Stone—in which he agreed "[t]he general orders do not give an officer discretion to speed without using their sirens and lights"—is *evidence Rangel could not violate those orders.* And they cite to the deposition testimony of Floyd Burke, another Dallas police officer, who responded in the nega-

---

11. As noted earlier, the General Orders do not require an officer to respond to a Code 1 call by upgrading it to a Code 3 and activating his emergency warning devices. Further, General Order 301.03 does not prohibit an officer from exceeding the speed limit when responding to a Code 1 call. Rather, that section instructs officers to "proceed with the normal traffic flow," not proceed at or below the posted speed limit. And General Order 301.04(D) provides only that an emergency vehicle should not be driven faster than the normal flow of traffic "[e]xcept when driven [sic] Code 3 . . . ."

tive when he was asked, "Based on your understanding of the general orders . . ., was Officer Rangel justified for driving over the speed limit without using his red and blue signals and his siren?" Additionally, in Navarro's deposition he asked, "[L]et's assume that the flow of traffic is not in excess of the posted speed limit. . . . If that is the case, is there anything in the general orders that would permit an officer to drive in excess of the speed limit without being in Code 3?" Navarro replied. "[M]aybe not."

The testimony of these witnesses addresses what the General Orders required and what Rangel should have done. Again, this evidence may [12] be relevant as to whether Rangel was negligent, but it falls short of constituting evidence that no reasonable officer in Rangel's position could have thought the facts were such that they justified Rangel's actions. *See id.* at 657.[13]

We conclude that the Brookses failed to raise a fact issue on whether Rangel was acting in good faith when he responded to the call for backup. *See id.* at 653. Thus, we conclude the evidence proved as a matter of law that Rangel was acting in good faith when he responded to the call for backup. *See id.* We resolve the City's issue in its favor to this extent.

## V. CONCLUSION

We conclude the City conclusively proved each element of Rangel's official immunity affirmative defense, and thus proved its governmental immunity from suit. Therefore, the trial court erred by denying the City's plea to the jurisdiction.

---

**12.** In light of the plain language of Code 1 and absent an accompanying explanation in support of their answers, the testimony of these witnesses as to what the General Orders require is wholly conclusory. *See Wadewitz,* 951 S.W.2d at 466–67; *Burrow,* 997 S.W.2d at 235.

*See Hayes,* 327 S.W.3d at 116. Accordingly, we reverse the trial court's order denying the City's plea and dismiss this suit for lack of jurisdiction.

---

**13.** Additionally, the evidence was undisputed that there were "no other vehicles traveling on the roadway." Thus, Navarro's evidence addressing a hypothetical situation rested on a counter-factual premise.