**CITY OF HOUSTON, Appellant**

v.

**Paula COLLINS, Appellee**

**NO. 14–16–00449–CV**

Court of Appeals of Texas,
Houston (14th Dist.).

Opinion filed January 31, 2017

Fernando De Leon, Houston, TX, for Appellant.

William R. Edwards, III, Russell T. Jackson, Corpus Christi, TX, Les Cochran, Houston, TX, for Appellee.

Panel consists of Justices Boyce, Christopher, and Brown.

## OPINION

William J. Boyce, Justice

Appellee Paula Collins sued the City of Houston after she was injured when a Houston police officer struck her vehicle. In this interlocutory appeal, the City contends the trial court erred by denying the City's plea to the jurisdiction. The City argues there is no waiver of its governmental immunity from suit because the police officer was entitled to official immunity. We reverse and render judgment dismissing Collins's suit against the City.

### BACKGROUND

Houston Police Department Officer James Brown was in a parked patrol vehicle on the evening of June 26, 2009, when he overheard the following radio broadcast from Officer Lomorris Forniss:

I'm southbound East Tex Freeway, just crossing over Aldine Mail Route. I have a male on a motorcycle, reckless driving. He's standing up on the thing at a high rate of speed.

A minute later, the dispatcher asked Officer Forniss for an update, and Officer Forniss responded:

He's gunning it. He's taking off right now. We're getting ready to come up to Little York. He's in the fast lane.

The dispatcher replied:

That's clear. Any 17–40 B units close to the freeway can check by 59 approaching Little York? Male on a motorcycle.

Because he was nearby, Officer Brown radioed that he would respond to assist Officer Forniss.

While en route to assist, Officer Brown saw Collins's vehicle exit a parking lot and turn right onto the road in front of Officer Brown. As Officer Brown approached in the right lane, Collins changed lanes to the left lane. Collins then changed lanes back to the right lane and came to a stop in front of Officer Brown. Officer Brown struck Collins's vehicle while attempting to go around Collins, causing Collins's vehicle to roll onto its side.

Collins sued the City for personal injuries in 2010, claiming that Officer Brown's reckless operation of an emergency vehicle caused the accident. The City filed a plea to the jurisdiction (the "first plea") in which it asserted that it was entitled to governmental immunity under the Texas Tort Claims Act. The trial court granted the City's first plea, and Collins filed an interlocutory appeal. *See Collins v. City of Houston*, No. 14–13–00533–CV, 2014 WL 3051231, at *1 (Tex. App.–Houston [14th Dist.] July 3, 2014, no pet.) (mem. op.).

In that appeal, neither party disputed that Officer Brown was acting within the course and scope of his employment when he responded to the radio call for assistance. *Id.* at *4. The issues before us were whether Officer Brown's injury-producing conduct was discretionary or ministerial, and whether Officer Brown acted in good faith. *Id.* We concluded that Officer Brown was performing a discretionary function at the time of the accident. *Id.* at *4–5. We further concluded, however, that the City

failed to establish that Officer Brown acted in good faith because the City relied on an unsupported assumption that Officer Brown was responding to a call concerning a motorcyclist who was fleeing from police. We stated as follows:

> The City's affidavits analyze Officer Brown's response based on the assumption that the motorcyclist evaded a traffic stop and fled from police. The radio transcript excerpts proffered into evidence do not state that the motorcyclist evaded arrest or was fleeing from police; they also do not state that an emergency situation existed. Instead, the radio transcripts reveal that the dispatcher requested assistance to apprehend a motorcyclist who was driving recklessly.

> To establish good faith under these circumstances, the City was required to demonstrate that a reasonably prudent officer could conclude that the need to respond to a speeding motorcyclist driving recklessly outweighed the risk to the public caused by the officer's action in exceeding the speed limit while responding. We do not exclude the possibility that the City could do so; however, on this record, the City did not address such a balance of risks. Instead, the City's proffered evidence focuses on a materially different balance of risks involving whether a reasonably prudent officer could conclude that the need to respond to a motorcyclist who evaded a traffic stop and fled from police outweighed the risk of speeding while responding.

> Because it relies on assumptions that are not supported by the record, the expert opinions proffered by the City do not address whether Officer Brown's decision to exceed the speed limit was justified based on the call for assistance he received under the specific circumstances in which he received it. On this record, therefore, the City failed to establish that Officer Brown acted in good faith in a circumstance that did not involve the driver of a motor vehicle fleeing arrest.

*Id.* at *6. We reversed the trial court's order granting the plea to the jurisdiction and remanded for further proceedings. *Id.* at *8.

The City filed a second plea to the jurisdiction in February 2016 (the "second plea"). The City submitted new affidavits with the second plea and alleged that the new evidence conclusively established that Officer Brown acted in good faith in responding to the radio call of a speeding and reckless motorcyclist who fled from police.

The trial court denied the City's second plea on May 17, 2016. This appeal followed.

## ANALYSIS

In a single issue, the City contends the trial court erred in denying the City's plea to the jurisdiction because Officer Brown was entitled to official immunity, and thus was not "personally liable to the claimant according to Texas law" so as to waive the City's governmental immunity under the Texas Tort Claims Act.

### I. Standard of Review

 If a governmental unit has immunity from a pending claim, a trial court lacks subject-matter jurisdiction as to that claim. *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012). A plea to the jurisdiction questioning the trial court's jurisdiction raises a question of law that we review *de novo*. *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007).

 The standard of review for a plea to the jurisdiction "generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)." *Tex.*

*Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004). When a governmental unit challenges the existence of jurisdictional facts and the parties submit evidence relevant to the jurisdictional challenge, we consider that evidence when necessary to resolve the jurisdictional issues. *Id.* at 227. We credit as true all evidence favoring the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.* at 228.

If the evidence raises a fact issue regarding jurisdiction, the plea to the jurisdiction must be denied. *Id.* at 227–28. If, however, the relevant evidence is undisputed or does not present a jurisdictional fact issue, the plea should be granted. *Id.* at 228.

## II. Collins's Ability to Sue the City

Political subdivisions of the state—including cities—are entitled to immunity from suit under the doctrine of governmental immunity. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). Under the doctrine, the City is not liable for the torts of its agents or officers unless there is a constitutional or statutory waiver of immunity. *City of Houston v. Daniels*, 66 S.W.3d 420, 424 (Tex. App.–Houston [14th Dist.] 2001, no pet.) (citing *Mount Pleasant Indep. Sch. Dist. v. Estate of Lindburg*, 766 S.W.2d 208, 211 (Tex. 1989)).

Section 101.021 of the Texas Tort Claims Act grants a limited waiver of immunity against a "governmental unit" for "property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if ... the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and ... the employee would

be personally liable to the claimant according to Texas law[.]" Tex. Civ. Prac. & Rem. Code Ann. § 101.021 (Vernon 2011). The City is a governmental unit under the statute. *Id.* § 101.001(3)(B) (Vernon Supp. 2016).

Official immunity is an affirmative defense that protects government employees from personal liability. *Univ. of Houston v. Clark*, 38 S.W.3d 578, 580 (Tex. 2000). If a governmental employee is entitled to official immunity, the employee is therefore not "personally liable to the claimant according to Texas law." *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.021; *City of Dallas v. Brooks*, 349 S.W.3d 219, 224 (Tex. App.–Dallas 2011, no pet.). And if the employee is not personally liable to the claimant, then the limited waiver under the Texas Tort Claims Act does not apply and the governmental employer remains immune from vicarious liability for the employee's actions. *Clark*, 38 S.W.3d at 580; *Tex. Dep't of Pub. Safety v. Rodriguez*, 344 S.W.3d 483, 488 (Tex. App.–Houston [1st Dist.] 2011, no pet.) ("In other words, if Sergeant Parker is immune from tort liability under the official immunity doctrine, DPS is also immune.").

## III. Is Officer Brown Entitled to Official Immunity?

A governmental employee is entitled to official immunity: (1) for the performance of discretion duties; (2) within the scope of the employee's authority; (3) provided the employee acted in good faith. *Tex. Dep't of Pub. Safety v. Bonilla*, 481 S.W.3d 640, 642–43 (Tex. 2015); *Clark*, 38 S.W.3d at 580. Because official immunity is an affirmative defense, the movant must conclusively prove each element of the defense. *Clark*, 38 S.W.3d at 580.

In the previous appeal in this case, we held that Officer Brown was performing a

discretionary function at the time of the accident. *See Collins*, 2014 WL 3051231, at *5. Neither party challenges that determination in this appeal. Likewise, Collins does not dispute that Officer Brown was performing duties within the scope of his employment at the time of the accident. Accordingly, the only issue in this appeal is whether Officer Brown was acting in good faith.

### A. Good Faith

█ In a police pursuit or emergency response case, an officer acts in good faith if a reasonably prudent officer under the same or similar circumstances could have believed that the need for the officer's actions outweighed a clear risk of harm to the public from those actions. *Bonilla*, 481 S.W.3d at 643; *Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997) (citing *City of Lancaster v. Chambers*, 883 S.W.2d 650, 656 (Tex. 1994)). Accordingly, the officer must assess "both the *need* to which an officer responds and the *risks* of the officer's course of action, based on the officer's perception of the facts at the time of the event." *Wadewitz*, 951 S.W.2d at 467 (emphasis in original).

█ "The 'need' aspect of the test refers to the urgency of the circumstances requiring police intervention." *Id.* In the context of an emergency response or police pursuit, the "need" is determined by looking to factors such as "the seriousness of the crime or accident to which the officer responds, whether the officer's immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect, and what alternative courses of action, if any, are available to achieve a comparable result." *Id.*; *see also Clark*, 38 S.W.3d at 583

(applying *Wadewitz* factors to a police pursuit case).

█ "Risk" refers to the countervailing public safety concerns. *Wadewitz*, 951 S.W.2d at 467. The "risk" is determined by looking to factors such as "the nature and severity of harm that the officer's actions could cause (including injuries to bystanders as well as the possibility that an accident would prevent the officer from reaching the scene of the emergency), the likelihood that any harm would occur, and whether any risk of harm would be clear to a reasonably prudent officer." *Id.*

█ Good faith does not require proof that every reasonably prudent officer would have resolved the need/risk analysis in the same manner under similar circumstances.[1] *Bonilla*, 481 S.W.3d at 643. Nor is evidence of good faith controverted merely because a reasonably prudent officer could have made a different decision. *Id.* Once the defendant produces competent evidence of good faith, the official immunity defense is established unless the plaintiff shows that no reasonable person in the officer's position could have thought the facts justified the officer's actions. *Id.*

█ Good faith can be established as a matter of law when an officer's recitation of the facts is otherwise supported by the evidence. *Harris Cty. v. Smyly*, 130 S.W.3d 330, 334 (Tex. App.–Houston [14th Dist.] 2004, no pet.). But conclusory statements that a reasonable officer could or could not have taken some action will not establish good faith. *Id.* at 336 (citing *Clark*, 38 S.W.3d at 581). "Instead, testimony on good faith must discuss what a reasonable officer could have believed under the circumstances, and must be sub-

---

1. In this regard, the good faith standard is different from the general negligence test, which addresses what a reasonable person would have done rather than what a reason-

able officer could have believed. *Wadewitz*, 951 S.W.2d at 467 n.1. Accordingly, "[e]vidence of negligence alone will not controvert competent evidence of good faith." *Id.*

stantiated with facts showing that the officer assessed both the need to apprehend the suspect and the risk of harm to the public." *Clark*, 38 S.W.3d at 581. No particular words are required to establish that a police officer considered the need/risk balancing factors. *Bonilla*, 481 S.W.3d at 645.

**B. The City's Evidence of Good Faith**

In support of its second plea, the City relies on affidavits from Sergeant Robert Musick and Dispatcher Sandra Semere, whose testimony was not included in support of the first plea. The City also relies on new affidavits from Officer Brown and Officer Forniss. In addition to the affidavits proffered by the City, the trial court also had before it, among other evidence, the deposition testimony of Sergeant Musick and Officer Forniss, which was attached to Collins's response to the second plea.

Sergeant Robert Musick overheard Officer Forniss's radio calls and was the on-scene sergeant after Officer Brown's crash. In his affidavit, Sergeant Musick averred that Officer Forniss provided information during the radio call that "he was either trying to catch up to or that the suspect was not stopping for [him] but that they were continuing to travel at above highway speeds." He explained that Officer Forniss provided additional information later during the call that, viewed as a whole, indicated that Officer Forniss "was chasing the suspect and that the suspect was not stopping": Officer Forniss had stress and urgency in his voice when he made the radio call; Officer Forniss made statements that "he's gunning it" and "we are getting ready to come up to Little York"; and "the fact that they continued to travel indicated that the motorcycle did not pull over." Based on the radio call he overheard, Sergeant Musick believed "that Officer Forniss was responding to an emergency situation that required an immediate response and that Officer Brown was responding to Officer Forniss'[s] call as a reasonable officer in an emergency manner."

Sergeant Musick explained that "a reckless, speeding motorcyclist on the Eastex Freeway ... requires an immediate response due to the dangers posed by motorcyclists who have no regard for their safety or the safety of others." He explained that "[m]otorists can be surprised by a motorcycle that veers beside them or in front of them," and that he had "known motorists to overreact by swerving, braking, stopping, striking a barrier wall or even crashing into surrounding traffic." Sergeant Musick explained that speeding, reckless motorcyclists are especially dangerous at night, when "the one headlight and the noise of the motorcycle muffler can easily surprise surrounding motorcyclists." Sergeant Musick averred that he had seen fatalities and serious bodily injuries as a result of reckless motorcyclists. As a result, he believed "Officer Forniss'[s] call about the reckless, speeding motorcyclist was unquestionably an emergency situation."

But Sergeant Musick explained further that "[w]hen a suspect does not comply with a traffic stop and takes off to avoid being stopped, the suspect is evading an attempted stop, and the suspect can be prosecuted for a state jail felony, pursuant to § 38.04 of the Texas Penal Code."

Sergeant Musick considered Officer Brown's response in light of the specific risks and conditions:

Given the situation, that it was a Friday night and innocent motorists were exposed to a speeding, reckless driver on the highway who was "gunning" away from Officer Forniss and "still going," despite being chased by a marked patrol unit, added by the urgency in Officer

Forniss'[s] voice, Officer Brown could have reasonably believed, as a reasonably prudent officer, that it was necessary to exceed the speed limit and travel around 50 mph in a 40 mph zone, maneuvering around traffic, to try to assist Officer Forniss. ...

...

... Officer Brown's decision to exceed the speed limit was justified based on the danger that the motorcyclist posed to himself and the public on the highway.

...

Driving 50 mph on Tidwell for 1.5 miles, a relatively straight road with 4 lanes, as traffic is yielding the right-of-way, with lights flashing,[2] would not pose an unreasonable risk of harm to other drivers. Yet a reckless, speeding motorcyclist who is standing up on his motorcycle and violating numerous traffic laws, on a busy, weekend night on the freeway did pose a serious threat to public safety.

...

Officer Brown's need to respond to the reckless, speeding motorcyclist and felony suspect who was endangering the lives of others at freeway speeds outweighed the risk to the public caused by Officer Brown exceeding the speed limit by about 10 miles per hour on a straight side street with moderate traffic while he was responding.

In his deposition, Sergeant Musick was asked: "Now, if Officer Forniss was just trying to catch up to the motorcyclist to perform an initial traffic stop, do you agree with me that that would not be an emergency situation?" Sergeant Musick responded: "No. Previously [Officer Forniss] says that the person is driving reckless[ly], standing on his seat, and at a high rate of speed. That would pose a danger to the general public, if not police officers ahead of him. So Officer Forniss pretty much has a duty to try to stop that before there are injuries."

Consistent with Sergeant Musick's interpretation of the radio call, Officer Brown averred in his new affidavit that he interpreted Officer Forniss's statements and tone of voice during the radio call as indicating "that a suspect had evaded Officer Forniss'[s] attempted stop and was fleeing down Highway 59." Officer Brown explained that Officer Forniss's statement that the suspect was "still" in the fast lane indicated that "he was continuing to flee from Officer Forniss and likely still traveling at a high rate of speed." Officer Brown "considered the situation Officer Forniss faced to be an emergency requiring an urgent response."

Officer Brown explained that "[t]he fact that the motorcyclist had been standing on his moving motorcycle and driving recklessly indicated that the motorcyclist had little regard for the public safety," and that based on his understanding of Officer Forniss's radio call, "the motorcyclist had committed a felony by not stopping for Officer Forniss, indicating that the motorcyclist would likely drive especially recklessly to avoid any further consequences of

2. There is conflicting evidence regarding whether Officer Brown engaged his siren, but it is undisputed that he engaged his emergency lights. Moreover, Sergeant Musick averred that, "[e]ven if [Officer Brown] was utilizing only his red lights, he would be in compliance with General Order 600–01 because use of his emergency equipment is discretionary," and that Officer Brown's "conduct would have been lawful and justifiable because he was still warning surrounding traffic of his presence and showing that he was responding in an emergency manner." Regardless, whether or not Officer Brown used a siren is not germane here, as Collins testified that she actually saw Officer Brown, pulled to the right, and stopped.

his actions." Officer Brown explained further that "motorcycles pose a unique danger" in that "they are less visible to other motorists," especially at night, and that "[t]hings that have little effect on a car, like debris, uneven road surfaces, and small objects can cause a motorcycle to crash, and increased speeds increase the possibility that a motorcycle or a motorcycle part can become a projectile that can injure or kill others." He explained that "[t]he motorcyclist could have had a flat tire, been thrown from his bike, clipped a car, run into a car, or kill[ed] someone," all of which "posed a serious danger to the motorcyclist, to Officer Forniss, and to the public."

Officer Brown explained that he weighed the need of quickly responding against the dangers posed by his response. He averred that the road he was traveling on was a straight, four-lane roadway; the speed limit was 40 miles per hour; the roadways were dry and the weather was clear; he was "intimately familiar with the traffic patterns, light pedestrian traffic, and street layouts in the area;" he engaged his emergency equipment to warn others of his emergency presence; and there were only three or four cars other than his in the nearby area, including Collins's car. Based on those factors, Officer Brown decided that driving up to 10 miles per hour over the speed limit for short periods of time would allow him to drive both quickly and safely under the conditions and circumstances. Officer Brown considered alternatives to his response, such as not responding or driving more slowly. But weighing the factors, he believed his emergency response was required.

Dispatcher Sandra Semere, who took Officer Forniss's radio call, testified in her affidavit that she understood Officer Forniss's call to mean "that the motorcycle was not pulling over for him but kept going faster, it was an evading situation."

Finally, Officer Forniss averred that he was attempting to convey that an emergency situation existed when he made his radio call, that he expected an emergency response to his call, and that he believed Officer Brown's response to be reasonable.

## C. Application

In the previous appeal, we concluded that the radio exchange by itself did "not state that the motorcyclist evaded arrest or was fleeing from police," but instead indicated only that the dispatcher requested assistance to apprehend a motorcyclist who was driving recklessly. *See Collins*, 2014 WL 3051231, at *6. The affidavits proffered by the City in support of the first plea stated that the suspect evaded arrest; they did not explain how a reasonable officer could have determined from the radio broadcast that the suspect was fleeing. *See id.* Because the City relied on the unsupported assumption that the motorcyclist was evading arrest, "the expert opinions proffered by the City [did] not address whether Officer Brown's decision to exceed the speed limit was justified based on the call for assistance he received under the specific circumstances in which he received it." *Id.* Accordingly, we concluded that, "[t]o establish good faith under these circumstances, the City was required to demonstrate that a reasonably prudent officer could conclude that the need to respond to a speeding motorcyclist driving recklessly outweighed the risk to the public caused by the officer's action in exceeding the speed limit while responding." *Id.*

 In this appeal, the City contends that it established Officer Brown's good faith in responding to a radio call for a speeding and reckless motorcyclist who evaded a traffic stop and fled from police. It is undisputed that the motorcycle sus-

pect was not arrested; Collins disputes whether Officer Brown reasonably could have believed from the radio broadcast that the suspect was evading arrest, and, if not, whether a radio call for reckless driving and speeding alone could have justified Officer Brown's response.

We conclude that the City has established that Officer Brown acted in good faith when he responded to a radio call which he reasonably believed to be requesting assistance for a reckless and speeding motorcyclist who then evaded arrest. The evidence of what was said during the radio call has not changed since we last reviewed it; instead, what persuades us that the City now has established good faith is that the City has presented additional evidence concerning how a reasonable officer would interpret the radio call.

Reviewing the evidence, Sergeant Musick explained that Officer Forniss's radio call indicated that Officer Forniss "was either trying to catch up to or that the suspect was not stopping for [him] but that they were continuing to travel at above highway speeds," that Officer Forniss "was chasing the suspect" and "the suspect was not stopping," and that "the fact that [Officer Forniss and the suspect] continued to travel indicated that the motorcycle did not pull over." Based on the radio call he overheard, Sergeant Musick believed "that Officer Forniss was responding to an emergency situation that required an immediate response and that Officer Brown was responding to Officer Forniss'[s] call as a reasonable officer in an emergency manner."

Sergeant Musick identified the dangers posed by a reckless, speeding motorcyclist, and concluded that "Officer Forniss'[s] call about the reckless, speeding motorcyclist was unquestionably an emergency situation." Sergeant Musick further explained the situation also was an emer-

gency because the motorcyclist became a felony suspect once he fled from Officer Forniss. Sergeant Musick averred that "Officer Brown's need to respond to the reckless, speeding motorcyclist and felony suspect who was endangering the lives of others at freeway speeds outweighed the risk to the public caused by Officer Brown exceeding the speed limit by about 10 miles per hour on a straight side street with moderate traffic while he was responding." Sergeant Musick concluded that Officer Brown's response was reasonable, and that "[n]o reasonable police officer in the same or similar situation could have thought that Officer Brown was unreasonable in responding to Officer Forniss'[s] Code 2 call in an emergency manner."

Officer Forniss averred that when he made his radio call, he was trying to convey to other police units that the motorcyclist was running from him. Officer Forniss stated in his affidavit that if he had heard his radio reports made by another officer, he would have responded to the call in the same or a similar manner to how Officer Brown responded, and he believed that Officer Brown's response to the call was reasonable.

Police Dispatcher Semere testified in her affidavit that she interpreted Officer Forniss's call to mean "that the motorcycle was not pulling over for him but kept going faster, it was an evading situation" and that she coded the call as an emergency call. This is additional evidence that a reasonable officer could have interpreted Officer Forniss's call as a request for assistance in the pursuit of a fleeing suspect— as opposed to a request in the pursuit of a reckless and speeding motorcyclist.

Finally, Officer Brown averred that he actually interpreted the radio call as one involving a speeding reckless motorcyclist who then fled when Officer Forniss at-

tempted a traffic stop, and explained his reasoning for his belief.

Viewing the City's evidence with the understanding that Officer Brown reasonably believed he was responding to a motorcyclist who was evading arrest, the evidence supports a finding that Officer Brown's actions in responding were conducted in good faith.

Both Sergeant Musick and Officer Brown identified the "need" for Officer Brown's immediate response by discussing the dangers posed by a motorcyclist who is attempting to evade arrest and committing a felony offense in the process. Sergeant Musick explained that "[m]otorists can be surprised by a motorcycle that veers beside them or in front of them," and that he had "known motorists to overreact by swerving, braking, stopping, striking a barrier wall or even crashing into surrounding traffic." Sergeant Musick explained that speeding, reckless motorcyclists are especially dangerous at night, when "the one headlight and the noise of the motorcycle muffler can easily surprise surrounding motorcyclists." Sergeant Musick averred that he had seen fatalities and serious bodily injuries as a result of reckless motorcyclists. Officer Brown likewise explained that "motorcycles pose a unique danger" in that "they are less visible to other motorists," especially at night, and that "[t]hings that have little effect on a car, like debris, uneven road surfaces, and small objects can cause a motorcycle to crash, and increased speeds increase the possibility that a motorcycle or a motorcycle part can become a projectile that can injure or kill others." He further explained

that "[t]he motorcyclist could have had a flat tire, been thrown from his bike, clipped a car, run into a car, or kill[ed] someone," all of which "posed a serious danger to the motorcyclist, to Officer Forniss, and to the public."

Sergeant Musick and Officer Brown both addressed the "risks" involved in Officer Brown's response. Sergeant Musick noted that "Officer Brown took precautions to minimize the threat of his driving to other motorists by traveling only 10 miles over the speed limit on Tidwell, a roadway that is often traveled in excess of 50 miles per hour, the streets were dry, the weather was clear, he activated his emergency lights, and ... at least 1 of the 3 witnesses said that they heard his siren." Officer Brown similarly acknowledged that any emergency pursuit involves risks to the public of a collision, but discussed his attempts to mitigate that risk by utilizing his training in emergency driving, utilizing his emergency lights to warn other vehicles, and by only traveling 10 miles per hour over the posted speed limit for short periods of time.

Regarding alternative courses of action, Officer Brown acknowledged that he also could have chosen not to respond to Officer Forniss's call or could have driven more slowly in responding. Instead, he decided that the dangers posed by the motorcyclist required him to drive as quickly as he felt was safe in order to provide backup to Officer Forniss, who was alone. Officer Brown believed his help in quickly apprehending the suspect could reduce the risk of injury to Officer Forniss, to the public, and to the motorcyclist.[3]

---

3. Collins contends that the City fails to specifically discuss certain risks such as the risk that driving over the speed limit in the right lane could lead to a collision or how other drivers would react to seeing an officer approaching with his emergency equipment activated. "Magic words are not required to establish that a law-enforcement officer considered the need/risk balancing factors." *Bonilla*, 481 S.W.3d at 645. Although Officer Brown's affidavit did not specifically discuss every possible risk that he could have encoun-

Based on the foregoing, we conclude that the City met its burden to present evidence that a reasonably prudent officer, under the same or similar circumstances, could have reasonably believed that the need for an immediate response outweighed the risks of the pursuit posed to the public. *See Clark*, 38 S.W.3d at 586; *Wadewitz*, 951 S.W.2d at 467.

**D. Collins's Evidence**

 Having concluded that the City met its burden to establish that Officer Brown acted in good faith, we must determine whether Collins controverted that proof by presenting evidence that no reasonable officer in Officer Brown's position could have thought the facts justified Officer Brown's actions. *See Bonilla*, 481 S.W.3d at 643.

Collins initially argues that the City's new affidavits presented with its second plea are conclusory and therefore do not constitute evidence of good faith. Collins contends that the new affidavits are conclusory and contradict the previous affidavits filed with the first plea. Collins argues that the new affidavits analyze the reasonableness of Officer Brown's response to a speeding, reckless motorcyclist, whereas the prior affidavits analyzed the situation under the assumption that the motorcyclist was evading arrest.

The affidavits filed with the second plea explain the necessity for an immediate response to a reckless, speeding motorcyclist who then evades an attempted police stop. They can be reconciled with the earlier affidavits because they provide the missing link explaining that reasonable officers could have interpreted the radio call as

describing a motorcyclist who was driving dangerously and then fled from a police officer. The new affidavits do not change the underlying factual assertions, but instead provide additional context to explain Officer Brown's response considering what he reasonably understood to be the situation. The new affidavits were substantiated with facts showing that Officer Brown assessed the need for his response against the risks to the public. They also demonstrate that other officers thought that Officer Brown reasonably could have believed that the radio call required him to respond in the manner in which he responded. We conclude the new affidavits are not conclusory. *See Royal v. Harris Cty.*, No. 14–08–00551–CV, 2010 WL 610604, at *5–6 (Tex. App.–Houston [14th Dist.] Feb. 23, 2010, pet. denied) (mem. op.) (affidavits that sufficiently addressed the "need" and "risk" factors to support the conclusion that a reasonable officer could have balanced the need and risks as the responding officer did and likewise elected to continue the pursuit were not conclusory).

Regarding controverting evidence, Collins does not present any expert opinion evidence; instead, she presents evidence that Officer Forniss's radio call for a reckless, speeding motorcyclist should have been classified as a "Priority 4" call requiring a non-emergency response under the Houston Police Department's guidelines. Collins contends that, because a priority 4 call requires that a responding officer "will not use emergency equipment, and will obey all traffic laws," no reasonable officer could have responded to the call as Officer Brown did.

tered in responding to an emergency radio call, his discussion of the general risks and his attempt to mitigate those risks was sufficient. *See id.* ("The fact that the trooper did not expressly identify 'alternatives' that may have been considered does not render the evidence

deficient."); *Clark*, 38 S.W.3d at 586 ("[A]n officer should not be required in his affidavit to affirmatively negate the existence of all circumstances or risks that did not actually exist.").

Because we have determined that Officer Brown could have reasonably believed that he was responding to a call regarding a suspect who not only was driving recklessly and speeding but also was evading arrest—a more serious offense—evidence regarding how the radio call should have been initially coded does not controvert the City's evidence that Officer Brown acted in good faith when he responded to the evolving situation.[4] Accordingly, Collins has failed to provide evidence that no reasonable officer could have thought the facts were such that they justified Officer Brown's actions. *See Chambers*, 883 S.W.2d at 657; *see also Brooks*, 349 S.W.3d at 233 (Where evidence was presented that officer violated the department's General Orders by speeding without using emergency equipment when responding, the court of appeals noted that "[t]he testimony of these witnesses addresses what the General Orders required and what Rangel should have done. Again, this evidence may be relevant as to whether Rangel was negligent, but it falls short of constituting evidence that no reasonable officer in Rangel's position could have thought the facts were such that they justified Rangel's actions.").

### CONCLUSION

Having concluded that the City conclusively proved that Officer Brown acted in good faith and that Collins did not successfully controvert the City's evidence, we conclude that the City established Officer Brown's entitlement to official immunity and, therefore, its own entitlement to governmental immunity. Accordingly, we reverse the trial court's order denying the

City's plea and dismiss this suit for lack of jurisdiction. *See Brooks*, 349 S.W.3d at 233.

---

4. Evidence was presented that the radio call was actually classified as a priority 2 call requiring an emergency response, but no evidence was presented that Officer Brown was aware of the call's coding when he responded; thus, the coding assigned by the dispatcher could not have influenced Officer Brown's response and does not affect our analysis.