02-11-342-CV










 

 

 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

 

NO. 02-11-00342-CV

 

 


 
 
 City of Fort Worth, Texas
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Harmit Chattha
 
 
  
 
 
 APPELLEE 
 
 


 

 

----------

 

FROM THE 352nd
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I.    
Introduction

Appellant
City of Fort Worth appeals the trial court’s order denying its plea to the jurisdiction.
 We reverse and remand.

II.  
Factual and Procedural Background

On
February 10, 2010, Fort Worth Police Officer Byrd conducted a traffic stop
while on duty.  Believing the driver to be intoxicated, Officer Byrd called for
a DWI unit to conduct a field sobriety test.  While awaiting this unit, Officer
Byrd told Lisa Valenzuela, the front seat passenger, to call someone to pick up
the car’s passengers; she called her brother, Alex Morfin.

According
to Officer Byrd, Appellee Harmit Chattha, one of the back seat passengers,
refused to leave and insisted that the vehicle be released to him instead of being
towed.  What happened next is the subject of dispute, and what follows are
excerpts from affidavits submitted by Officer Byrd, Chattha, and two witnesses.

According
to Officer Byrd, 

Based on Mr.
Chattha’s behavior in refusing my reasonable requests to move away from
traffic, and my observations of him that he had a strong smell of alcoholic
beverage on his person, that he had bloodshot eyes, slurred speech, and was
swaying, I determined that I had probable cause to believe that Mr. Chattha was
intoxicated to the degree that he was a danger to himself and others, and
decided to arrest Mr. Chattha for Public Intoxication.  I told him he was under
arrest.  I grabbed him by the left hand and leaned him against the door of the
BMW.  I took my handcuffs to place them on Mr. Chattha.  I was able to place a
handcuff on his left wrist.  I attempted to grab Mr. Chattha’s right arm but he
stiffened his arm, thus frustrating the arrest process.  I warned Mr. Chattha
not to resist.  Mr. Chattha then jerked his arm free and was able to turn away
from me toward the open driver’s door of the BMW.  The female who was getting
her purse began to scream for me not to arrest him.  She climbed through the
BMW and came out on the driver’s side of the door, therefore Mr. Chattha was
now facing her.  Both Mr. Chattha and the female were between me and the
driver’s seat.  I could not see Mr. Chattha’s right hand, and based on our positions
at the vehicle, and his continued resistance to my attempt to handcuff him, I
decided to take him to the ground in order to complete the arrest process.

 

I determined that the
only way I could take Mr. Chattha to the ground safely without throwing him
into traffic was to take him down directly behind me.  I was still holding on
to the handcuff on Mr. Chattha’s left arm.  I grabbed the back shoulder area of
his shirt, twisted him around and took him to the ground.  As he went to the
ground, our legs became entangled, and I fell to the ground also.  I landed on
the lower half of Mr. Chattha’s body.  I observed that Mr. Chattha went limp as
soon as he struck the ground. . . . 

 

I made the decision
to take Mr. Chattha to the ground in an effort to gain control of him because
he was resisting my attempt to arrest him.  I intentionally took Mr. Chattha to
the ground. . . . 

 

I believe the force
used on Mr. Chattha was necessary and reasonable because he was actively
resisting my attempt to arrest him, he was resisting near traffic, he was close
enough to a running vehicle to take control of the vehicle in an intoxicated
state, and I was outnumbered by his friends on the scene.

 

According
to Chattha, 

I was trying to talk
to the officer but I was not threatening anyone, staggering, walking into
traffic or slurring my words.  I don’t recall a lot of the details after I was
handcuffed but I do remember the officer telling me to turn around, which I
did.  Then he grabbed my arm to cuff my hand behind my back.  I had a car fall
from a lift onto my left arm some months prior to this and still suffered from
physical injury from that incident.  So the range of motion in my arm was not
good.  I was not struggling or resisting but it was not easy to get my arm
behind me because of the injury.  That is the last thing that I remember until
waking up in the hospital.

 

According
to Alex Morfin, Chattha’s brother-in-law and a witness, he went to pick up the
passengers after Valenzuela called him.  In his affidavit, Morfin stated:

I could not clearly
hear everything, but I did hear [Chattha] tell the officer that he could take
the car.  [Chattha] was not staggering or slurring his words.  He was not doing
anything dangerous.  I next saw Officer Byrd grab [Chattha] and slam him
against the car.  The officer got one side of the handcuffs on.  [Chattha] has
an arm injury from a time when a car fell from a jack and landed on his arm.  It
was a severe injury and his arm did not work normally.  I could see that his
arm was not bending back easily to put the other cuff on and then the officer
grabbed him and swung him around like a rag doll.  The officer threw [Chattha]
to the ground head first.  Since Officer Byrd had [Chattha] at least partially
in handcuffs and was holding the cuff, [Chattha] had no way to break his fall
and his head slammed into the ground, knocking him unconscious.

 

According
to Valenzuela, Chattha’s sister-in-law,

When we were
initially pulled over, I called my brother who was nearby and told him that we
were being pulled over.  My brother and his friend Joe were in a separate
vehicle.  They were not intoxicated and they arrived at the scene quickly.  There
was no legitimate reason that one of us could not drive the car home.  It
seemed as if the officer refused to talk to us about it for no good reason.  At
that point, [Chattha] said something about calling an attorney.  The officer
responded by telling [Chattha] to put his hands behind his back and was going
to handcuff him.  We were very surprised and [Chattha] said[,] “[B]ut I didn’t
do anything!”  The officer responded with[,] “[O]h, yeah!” and slammed
[Chattha] onto the car at the driver’s side behind the driver’s side door. 
[Chattha] was not swaying or acting drunk.  He was not slurring his words and
was not staggering into traffic.  He was speaking to the officer clearly and
walking normally.  He wasn’t doing anything dangerous.  He was just trying to talk
to the police officer.

 

After the officer
slammed [Chattha] against the car, the officer was trying to handcuff
[Chattha].  [Chattha] had an injury to his arm that affected how far back it
would go.  [Chattha] did not resist in any way[;] he did not struggle[,] and he
did not pull away.  [Chattha] did not say anything during this time.  But the
officer grabbed [Chattha] behind his neck and turned him to the side.  The
officer then threw his weight onto [Chattha’s] back, throwing him to the ground
and landing on top of him.  I screamed and rushed to [Chattha] and turned him
over. There was blood coming out of his ear and his mouth and he was
unconscious.  I knew he was severely hurt.

 

Chattha
subsequently filed suit against the City for his injuries.  The City then filed
a plea to the jurisdiction, which the trial court denied, and this appeal
followed.

III. 
Jurisdiction

The
City argues that its plea to the jurisdiction should have been granted under
the Texas Tort Claims Act (TTCA) because there was no use of tangible personal
property; the officer’s official immunity applied, precluding a waiver of the
City’s immunity; and the act committed by the officer was an intentional tort.

A.
Standard of Review

A plea
to the jurisdiction contests a trial court’s subject matter jurisdiction, which
is a question of law that we review de novo on appeal.  City of Borger v.
Garcia, 290 S.W.3d 325, 329 (Tex. App.—Amarillo 2009, pet. denied); see
Tex. Dep’t of Transp. v. Jones, 8 S.W.3d 636, 638–39 (Tex. 1999).  The
plea is used to defeat a cause of action without regard to whether the claims
asserted have merit.  Garcia, 290 S.W.3d at 329 (citing Bland ISD v.
Blue, 34 S.W.3d 547, 554 (Tex. 2000)).  That is, normally the plea “should
be decided without delving into the merits of the case.”  Blue, 34
S.W.3d at 554.  However, “in some cases, disputed evidence of jurisdictional
facts that also implicate the merits of the case may require resolution by the
finder of fact.”  Tex. Dep’t of Parks & Wildlife v. Miranda, 133
S.W.3d 217, 226 (Tex. 2004).  Hence, in deciding whether the plaintiff has alleged
facts affirmatively establishing the trial court’s jurisdiction to hear the
cause, we may consider the facts alleged by the plaintiff and, to the extent it
is relevant to the jurisdictional issue, the evidence submitted by the
parties.  Garcia, 290 S.W.3d at 329; see also Miranda, 133
S.W.3d at 226 (citing Tex. Ass’n of Bus. v. Tex. Air Control Bd., 852
S.W.2d 440, 446 (Tex. 1993)).  If the evidence creates a fact question
regarding jurisdiction, the trial court must deny the plea and leave its
resolution to the fact finder.  Miranda, 133 S.W.3d at 227–28.  But if
the evidence is undisputed or fails to raise a fact question on the
jurisdictional issue, the trial court rules on the plea to the jurisdiction as
a matter of law.  Id. at 228.

If
the pleadings do not contain sufficient facts to affirmatively demonstrate the
trial court’s jurisdiction but do not affirmatively demonstrate incurable
defects in jurisdiction, the issue is one of pleading sufficiency, and the
plaintiff should be afforded the opportunity to amend.  Id. at 226–27 (citing
Cnty. of Cameron v. Brown, 80 S.W.3d 549, 555 (Tex. 2002)).

B.  Analysis

Chatta
sued under the TTCA, which provides that “[a] governmental unit in the state is
liable for: . . . (2) personal injury and death so caused by a condition or use
of tangible personal or real property if the governmental unit would, were it a
private person, be liable to the claimant according to Texas law.”  See Tex.
Civ. Prac. & Rem. Code Ann. § 101.021 (West 2011).

1.   
Use of Tangible Personal Property

The City
argues that “the officer actually used no tools, implements, or other personal
property” and that “the facts of the case, as provided in the record,
demonstrate that tangible personal property was not used in the
incident . . . .”  Chatta responds that he was injured by the
officer’s negligent use of the handcuffs in that the “take down” maneuver used
to throw him to the ground was executed while the officer held on to the
handcuffs, rendering Chattha unable to use his hands to break the fall.

Under
the TTCA, to “use” something is “to put or bring into action or service; to
employ for or apply to a given purpose.”  Tex. Natural Res. Conservation
Comm’n v. White, 46 S.W.3d 864, 869 (Tex. 2001).  The evidence presented
does not clearly support either position:  Morfin’s affidavit indicated that
the officer “swung [Chattha] around like a rag doll” while holding the cuff as
he threw him to the ground, while the officer’s affidavit indicated that he
“was still holding onto the handcuff on Mr. Chattha’s left arm” when he “took
him to the ground.”  This raises a fact question regarding the use of tangible personal
property sufficient to defeat this aspect of the City’s plea.

The City
also asserts that “the positioning of Officer Byrd’s hands, if anything, only
furnished the condition that made the injury possible,” which does not
constitute negligent use of property, citing Dallas County Mental Health &
Mental Retardation v. Bossley, 968 S.W.2d 339, 343 (Tex.), cert. denied,
525 U.S. 1017 (1998).  However, this contention is without merit, because it is
the handcuffs, not the officer’s hands, which are the personal property at
issue.  Further, unlike the unlocked door, which allowed a patient to escape
and commit suicide in Bossley, see id. at 341–43, the handcuffs
were an integral part of the injury-producing take-down in that either the
officer used the handcuffs to throw Chattha to the ground or held the handcuffs
while he threw Chattha’s body to the ground.  We hold that the officer’s hands
are not personal property and that the handcuffs furnished more than a
condition that made the injury possible.

2.   
The Officer’s Official Immunity

A government
employee is entitled to official immunity from suit if his alleged negligent
act occurs during the performance of a discretionary duty that is within the
scope of his authority and he acts in good faith.  Telthorster v. Tennell,
92 S.W.3d 457, 461 (Tex. 2002) (citing City of Lancaster v. Chambers,
883 S.W.2d 650, 653 (Tex. 1994)).  Chattha does not dispute that the City, as
the officer’s employer, is entitled to derivative immunity if the officer is
entitled to official immunity.  See City of Beverly Hills v. Guevara,
904 S.W.2d 655, 656 (Tex. 1995) (citing DeWitt v. Harris Cnty., 904
S.W.2d 650, 654 (Tex. 1995), for the proposition that a city can rely on the
official immunity of its employees and agents).  Nor does he dispute that an
officer’s decisions to make a traffic stop or an arrest are discretionary.  See
City of Dallas v. Brooks, 349 S.W.3d 219, 225 (Tex. App.—Dallas 2011, no
pet.) (describing the difference between ministerial and discretionary acts); Kistner
v. Pfannstiel, 107 S.W.3d 7, 11 (Tex. App.—San Antonio 2002, no pet.) (“[A]
law enforcement officer’s decision to file a criminal complaint is
discretionary because it calls for the officer’s ‘personal deliberation,
decision, and judgment.’”).  Therefore, we examine whether Officer Byrd has
established that he acted in good faith.

In Telthorster,
the supreme court set out what is necessary to establish “good faith”:

          To
establish good faith, Officer Telthorster must show that a reasonably prudent
officer, under the same or similar circumstances, could have believed that his
conduct was justified based on the information he possessed when the conduct
occurred.  Officer Telthorster need not prove that it would have been
unreasonable not to engage in the conduct, or that all reasonably prudent
officers would have engaged in the same conduct.  Rather, he must prove only
that a reasonably prudent officer, under similar circumstances, might
have reached the same decision.  That Officer Telthorster was negligent will
not defeat good faith; this test of good faith does not inquire into “what a
reasonable person would have done,” but into “what a reasonable officer could
have believed.” 

 

If Telthorster meets
this burden, [the complainant], to controvert, must do more than show that a
reasonably prudent officer could have reached a different decision.  Instead,
[the complainant] must offer evidence that no reasonable officer in
Telthorster’s position could have believed that the facts were such that they
justified his conduct.  “[I]f officers of reasonable competence could disagree
on this issue,” the officer acted in good faith as a matter of law.

 

92
S.W.3d at 465 (citations omitted).

The
only evidence before the trial court that could possibly be construed as
touching on the “reasonably prudent officer” standard here is the officer’s
statement, “I believe the force used on Mr. Chattha was necessary and
reasonable.”  We hold that this statement is insufficient to meet the City’s
burden because, otherwise, any officer could state on any set of facts that he
believed his actions were reasonable and be absolved of any responsibility,
compelling the grant of any city’s plea to the jurisdiction.  Nothing in
Officer Byrd’s affidavit or in the other affidavits before the court provides
any standard or benchmark to determine what “a reasonable officer would have
believed,” and we are not in a position to speculate.[2] 
We hold that the City has not met its burden to establish that the officer
acted in good faith.

3.   
Intentional Torts

The City
also asserts that the officer’s conduct constituted an intentional tort, which
is an exception to the waiver of immunity under the TTCA.  See Tex. Civ.
Prac. & Rem. Code Ann. § 101.057 (West 2011) (stating that the TTCA’s
waiver does not apply to claims arising out of assault, battery, or any other
intentional tort).  That is, the City argues that because there was nothing
accidental about the officer’s conduct in initiating the take-down maneuver to
get Chattha to the ground, which caused Chattha’s injuries, this exception to
the TTCA applies.

We
first address what constitutes an assault or battery.  “Civil courts look to
the Texas Penal Code for the elements of civil causes of action such as
assault.”  Childers v. A.S., 909 S.W.2d 282, 292 (Tex. App.—Fort Worth
1995, no writ).  Under the penal code, a person commits an assault if he intentionally,
knowingly, or recklessly causes bodily injury to another or intentionally or
knowingly causes physical contact with another when he “knows or should
reasonably believe that the other will regard the contact as offensive or
provocative.”  Tex. Penal Code Ann. § 22.01(a)(1), (3) (West 2011).  Battery
does not require an assault; rather, it requires only an offensive touching,
not an intent to injure.  Price v. Short, 931 S.W.2d 677, 687 (Tex.
App.—Dallas 1996, no writ) (citing Fisher v. Carrousel Motor Hotel, Inc.,
424 S.W.2d 627, 629 (Tex. 1967)).

“The
fundamental difference between negligent injury . . . and intentional injury is
the specific intent to inflict injury.”  Reed Tool Co. v. Copelin, 689
S.W.2d 404, 406 (Tex. 1985); Presley v. Republic Energy Drilling, L.L.C.,
No. 02-07-00225-CV, 2008 WL 4053002, at *5 (Tex. App.—Fort Worth Aug. 29, 2008,
no pet.) (mem. op.) (quoting Reed Tool).  As to assault or “any other
intentional tort,” there is no evidence that Officer Byrd intentionally or knowingly
caused bodily injury to Chattha.[3]

Based
on the affidavit evidence, however, there is a factual dispute as to whether
the officer acted recklessly.[4]  The officer’s affidavit describes
a situation in which a combative, inebriated individual did not comply with the
officer’s instruction, compelling the officer to take control of the situation
by taking the individual to the ground in a safe location behind the vehicle and
out of the traffic lane.  The other affidavits paint a different picture—that
of a sober, non-combative, previously-injured individual who did not need to be
taken down at all, much less in the officer’s injury-producing manner.  These
circumstances present a fact question as to whether the officer acted
recklessly and, hence, a fact question as to whether the TTCA’s exception for
assault applies.

However,
the evidence shows that the officer intended to touch Chattha and that Chattha
would consider it offensive.  That is, the officer states in his affidavit that
he “intentionally took Mr. Chattha to the ground,” and the other three
affidavits indicate that Chattha did not believe that he should be arrested,
let alone thrown to the ground, showing that the “touching” would be offensive
to him and that the officer should have known the touching would be offensive
or provocative to Chattha, constituting a battery.  See Tex. Penal Code
Ann. § 22.01(a)(3).  Therefore, because the evidence reflects that a
battery occurred, the trial court erred by denying the City’s plea on this
ground, and we sustain this portion of the City’s issue.

IV.
 Conclusion

Having
sustained part of the City’s sole issue based on the TTCA’s intentional tort
exception, we reverse the trial court’s order and remand this cause to the
trial court to afford Chattha the opportunity to replead.

 

PER CURIAM

 

PANEL: 
MCCOY, J.; LIVINGSTON, C.J.; and WALKER, J.

 

DELIVERED: 
February 16, 2012








 









[1]See Tex. R. App. P. 47.4.





[2]Were we to do so, we would
inject our own personal beliefs into this case instead of relying on the
evidence presented to the trial court. 





[3]Under the penal code, a
person acts “intentionally” when it is his conscious objective or desire to
engage in a specific conduct or to cause the result of his conduct.  See
Tex. Penal Code Ann. § 6.03(a) (West 2011).  He acts “knowingly” when he is
aware of the nature of his conduct or that the circumstances surrounding his
conduct exist or when he is aware that his conduct is reasonably certain to
cause the result.  Id. § 6.03(b).





[4]A person acts
recklessly when he is aware of but consciously disregards a substantial
and unjustifiable risk that the circumstances surrounding his conduct exist or that
the result of his conduct will occur, and the risk “must be of such a nature
and degree that its disregard constitutes a gross deviation from the standard
of care that an ordinary person would exercise under the circumstances as
viewed from the actor’s standpoint.”  Tex. Penal Code Ann. § 6.03(c).