**CITY OF SAN ANTONIO, Appellant,**

v.

**Jose TREVINO and Gloria Trevino, Appellees.**

No. 04–05–00253–CV.

Court of Appeals of Texas, San Antonio.

Oct. 18, 2006.

Dan Pozza, San Antonio, for appellant.

Andrew E. Toscano, Toscano Law Firm, San Antonio, for appellees.

Sitting: ALMA L. LÓPEZ, Chief Justice SARAH B. DUNCAN, Justice PHYLIS J. SPEEDLIN, Justice.

## OPINION

Opinion by SARAH B. DUNCAN, Justice.

The City of San Antonio appeals the trial court's order denying its plea to the jurisdiction and its traditional and no-evidence motions for summary judgment. We hold the City conclusively established its employee's official immunity from suit and therefore the City's governmental immunity. Accordingly, we reverse the trial court's order and render judgment dismissing the cause for lack of jurisdiction.

### APPLICABLE LAW

Jose and Gloria Trevino filed this suit against the City for personal injuries and property damage arising out of an automobile accident in which their Ford F150 pickup truck was hit by a Dodge Neon being driven by Richard Sanchez. As a general rule, a city is immune from suits for money damages. *See Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n. 3 (Tex.2003). However, the Trevinos allege that, because the accident was the result of a high-speed chase of Sanchez by one of the City's employees, San Antonio Police Officer Tony J. Arcuri, the City's immunity from suit is waived by section 101.021(1) of the Texas Tort Claims Act. Section 101.021(1) provides as follows:

A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negli-

gence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law. . . .

TEX. CIV. PRAC. & REM.CODE ANN. § 101.021(1) (Vernon 2005). But "sovereign immunity shields the governmental employer from vicarious liability" if "official immunity shields a governmental employee from liability." *Univ. of Houston v. Clark*, 38 S.W.3d 578, 580 (Tex.2000). "A governmental employee is entitled to official immunity: (1) for the performance of discretionary duties; (2) within the scope of the employee's authority; (3) provided the employee acts in good faith." *Id.*

The Trevinos concede the first and second elements of official immunity and dispute only the third—good faith. "[T]o establish good faith in a police pursuit case, an officer must conclusively prove that a reasonably prudent officer in the same or similar circumstances could agree that the need to immediately apprehend the suspect outweighed the risk of harm to the public in continuing the pursuit, taking into account all the *Wadewitz* [need and risk] factors." *Clark*, 38 S.W.3d at 583. These factors were summarized in *Clark* as follows:

The need element refers to the "urgency of the circumstances requiring police intervention," or "the seriousness of the crime or accident to which the officer responds, whether the officer's immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect, and what alternative courses of action, if any, are available to achieve a comparable result." The risk element of good faith refers to "the countervailing

public safety concerns," or "the nature and severity of harm that the officer's actions could cause (including injuries to bystanders as well as the possibility that an accident would prevent the officer from reaching the scene of the emergency), the likelihood that any harm would occur, and whether any risk of harm would be clear to a reasonably prudent officer."

*Id.* at 581 (quoting *Wadewitz v. Montgomery*, 951 S.W.2d 464, 467 (Tex.1997)). "[T]o controvert a police officer's summary judgment proof on good faith, the [respondent] must do more than show that a reasonably prudent officer could have decided to stop the pursuit." *Id.* "The [respondent] must show that no reasonable person in the officer's position could have thought that the facts justified the officer's acts." *Id.*

### STANDARD AND SCOPE OF REVIEW

On appeal, we review the trial court's rulings on a motion for summary judgment and a plea to the jurisdiction de novo. *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex.2005); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex.2004). In determining whether jurisdiction exists, "[w]e construe the pleadings liberally in favor of the plaintiffs and look to the pleaders' intent." *Miranda*, 133 S.W.3d at 226. "However, if a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised. . . ." *Id.* at 227. "If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder." *Id.* at 227–28. "However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional

issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Id.* at 228. "[T]his standard generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)." *Id.* Accordingly, "[w]hen reviewing a plea to the jurisdiction in which the pleading requirement has been met and evidence has been submitted to support the plea that implicates the merits of the case, we take as true all evidence favorable to the [respondent]." *Id.* "We indulge every reasonable inference and resolve any doubts in the [respondent's] favor." *Id.*

### FACTUAL AND PROCEDURAL BACKGROUND

Officer Arcuri testified that just before the accident (which his accident report reflects occurred at 12:55 a.m. on Wednesday, October 24, 2001) he was traveling northbound in the 400 block of San Joaquin, a residential area he had worked in for four and one-half years and of which he had a good understanding of the streets and intersections, which are lit by street lamps. There was no traffic at all in the area. However, Arcuri saw a Dodge Neon parked southbound in front of the house at 419 San Joaquin, which was known for drug and stolen vehicle trafficking. The occupants of the Neon appeared to be young. His suspicions aroused, Arcuri decided to turn around and check the Neon's license plate. Traveling at about thirty miles per hour, Arcuri went about six houses before turning around. As he turned around, the Neon drove off quickly and turned eastbound on Ruiz. Although he had no reason at that point to stop the Neon, he decided to follow it and so turned onto Ruiz. Unable to see the Neon, he stopped in the middle of the next intersection at Ruiz and North San Ignacio and saw the Neon north of the intersection on North San Ignacio. As the Neon got to the top of a hill on North San Ignacio, it again disappeared from Arcuri's view, so

Arcuri turned onto North San Ignacio and quickly accelerated, at that point exceeding the speed limit. By the time he got to the crest of the hill, the Neon was in the middle of the next intersection turning westbound onto Rivas at what appeared to be a high rate of speed. Since the Neon was speeding and appeared to have run the stop sign at North San Ignacio and Rivas, Arcuri had probable cause to stop it; but he was not physically close enough to do so. Although he did not turn on his vehicle's lights or siren, he had decided to try to catch up to the Neon and possibly stop it. Arcuri saw no one in the area. When Arcuri reached the intersection of North San Ignacio and Rivas, all Arcuri could see were the Neon's taillights as it turned into an S-curve on Rivas.

By the time Arcuri was through the S-curves on Rivas, the Neon was almost two blocks west of Arcuri and traveling at a high rate of speed. As Arcuri drove through the intersection of Rivas and Memorial, the Neon was already past the intersection of Rivas and 34th Street and approaching the T-intersection of Rivas and Rosabell. At that point, Arcuri got on his radio to see if another patrol car was close by. Before he was connected to the dispatcher, however, he saw the Neon run the stop sign at Rivas and Rosabell and hit the Trevinos' truck, which had the right-of-way, as it traveled northbound on Rosabell. At the point of impact, Arcuri was exceeding the speed limit. The two vehicles involved in the collision were obscured by the distance and disappeared for a moment just north of the intersection. Arcuri stopped his call, hit his lights, and continued to drive towards the scene of the accident. As he approached, he saw the Trevinos' truck on its side, the Neon beside it, and three people running southbound and into the yard at 157 Rosabell at the intersection. Before he reported the

accident, he pursued the fleeing people and caught Richard Sanchez in the backyard of 157 Rosabell. According to Arcuri's accident report, the accident was caused by Sanchez's disregard of the stop sign, exceeding the speed limit, and fleeing or evading the police.

The City's expert, Commander Albert Rodriguez, testified globally and in detail that Arcuri's actions were objectively reasonable and conducted in good faith. The Trevinos' expert, Joe Montgomery, testified Sanchez's and Arcuri's total route was eight-tenths of a mile and contained six stop signs. Montgomery observed 200 foot skid marks going through the stop sign before the Neon collided with the Trevinos' truck and estimates the Neon was traveling approximately seventy-one miles per hour before it started to brake, sixty-four miles per hour when it began skidding, and twenty to forty miles per hour at the time of the collision. In Montgomery's view, Arcuri did not exercise due care for citizens at all. However, he has no opinion on whether Arcuri acted in good faith except that he failed to "use[ ] the means available to him to warn the public of what was going on."

In response to the Trevinos' petition, the City answered and filed a plea to the jurisdiction or, alternatively, traditional and no-evidence motions for summary judgment on several grounds, including that its summary judgment evidence conclusively established Arcuri's official immunity and therefore the City's governmental immunity. The trial court denied the City's plea to the jurisdiction and its motions for summary judgment. This appeal ensued.

## DISCUSSION

■ The City argues that its summary judgment evidence satisfies the *Wadewitz* test, as applied in *Clark;* and the Trevinos'

summary judgment evidence fails to adequately controvert it. We agree.

In *Clark,* Kevin Thomas fled the scene of an on-campus fist fight, although told by the responding officers not to leave and before the officers could identify him. *Clark,* 38 S.W.3d at 579. "As Thomas left campus, Sergeant Jon Williams turned his patrol car sideways to try to stop Thomas, but Thomas drove his jeep around Williams' car." *Id.* Williams then radioed Officer Matthew Stewart to stop Thomas. *Id.* at 579–80. Stewart then "activated his lights and siren" and pursued Thomas. *Id.* at 580. "During the chase, Thomas ran a red light and collided with another vehicle, injuring Demetria Clark." *Id.* From the court of appeals' opinion, it appears the chase reached speeds of ninety miles per hour. *Clark v. University of Houston,* 979 S.W.2d 707, 713 (Tex.App.-Houston [ (Tex.App.-Houston [14th Dist.]] 1998)), *rev'd,* 38 S.W.3d 578 (Tex.2000). Applying the *Wadewitz* test for good faith, the supreme court held "Williams and Stewart established good faith as a matter of law." *Clark,* 38 S.W.3d at 587.

### *Need*

The supreme court held the need element in Sergeant Williams's case was met by his testimony that the suspect had been involved in assaultive conduct and the Class B misdemeanor of evading detention, had not yet been identified, and posed a danger to the public. *Id.* at 585. The court held the need element was met in Officer Stewart's case by his testimony that the subject had been involved in a fight, evaded detention, and traveled at a high rate of speed, with no regard for the public safety and "needed to be stopped." *Id.* at 586. The situation here, although not involving assaultive conduct, is similar. According to Officer Arcuri, he saw the Neon parked in front of a house known for

drug and stolen vehicle trafficking and later observed its driver violate numerous laws—disregarding at least two stop signs, traveling at a high rate of speed, and evading police presence—but he was unable to get close enough even to read the Neon's license plate, much less identify the suspect or even signal him to stop.

### Available Alternatives

In *Clark*, the supreme court held that the requirement that the officer consider available alternatives was met in Officer Stewart's case by his testimony that he was unable to get close enough to read the fleeing suspect's license plate. *Id.* We likewise hold that Officer Arcuri's testimony that he was unable to get close enough to the Neon to read its license plate satisfies this requirement.

### Risk

The risk element was met in Sergeant Williams's case by his testimony that it was around 2:00 a.m.; the weather was clear and the streets were dry; the traffic was light, with no other cars in the primarily commercial area in which the pursuit occurred. *Id.* at 585. This element was met in Officer Stewart's case by his testimony that he was familiar with the streets in the primarily commercial area in which the pursuit occurred; the traffic was light; and it was 2:00 a.m. *Id.* at 586. Officer Arcuri's incident report and testimony, like that of Sergeant Williams and Officer Stewart, establishes that his pursuit of the Neon posed a low risk of harm to the public: it was just short of 12:55 a.m.; there was no traffic in the area nor were there any pedestrians; the streets were dry and lit by street lamps; and he was familiar with the streets in the area.

### Controverting Testimony

In *Clark*, the supreme court held that the affidavit testimony of Richard H.

Turner, the chief executive officer of the National Academy for Professional Driving, was conclusory and therefore insufficient to controvert the defendant's proof of good faith because it "is not substantiated with reference to each aspect of the need and risk balancing test...." *Id.* at 587. So it is here. Although Montgomery testified in a conclusory fashion that Arcuri failed to exercise due care for citizens and failed to warn the public, he did not substantiate his conclusions with reference to each aspect of the need and risk balancing test and, indeed, otherwise testified he had no opinion on whether Arcuri acted in good faith.

### CONCLUSION

Because the City's summary judgment evidence conclusively establishes that Arcuri acted in good faith and that evidence is not controverted by the Trevinos' summary judgment evidence, the City established its governmental immunity from suit. We therefore reverse the trial court's order denying the City's plea to the jurisdiction and dismiss this cause for lack of jurisdiction.