**Reversed, Rendered, and Opinion Filed July 31, 2024**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-23-00376-CV**

_____

**CITY OF DALLAS, Appellant**

**V.**

**BRANDIE PEREZ, INDIVIDUALLY AND AS NEXT FRIEND TO A.P.,**
**G.P. AND S.P., MINORS, Appellees**

**On Appeal from the County Court at Law No. 4**
**Dallas County, Texas**
**Trial Court Cause No. CC-22-02375-D**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Pedersen, III, and Garcia
Opinion by Justice Partida-Kipness

The underlying proceeding arises from a motor vehicle collision involving an on-duty Dallas police officer and appellee Brandie Perez. The City of Dallas appeals the trial court's order denying the City's plea to the jurisdiction. The City maintains the trial court lacks subject matter jurisdiction because the officer is entitled to official immunity from Perez's claims and the officer's actions satisfied the emergency exception under the Texas Tort Claims Act (TTCA). We conclude the City is entitled to official immunity as a matter of law. We, therefore, reverse the

trial court's order denying the City's plea to the jurisdiction and render judgment dismissing appellees' claims for lack of jurisdiction.

## BACKGROUND

This case arises from a collision between a police vehicle driven by Officer Jose Gamez of the Dallas Police Department (DPD) and a vehicle driven by Perez. On August 3, 2022, Gamez was assigned to an overtime shift with the DPD's illegal street racing task force. At approximately 1:35 a.m., Gamez was dispatched through the 9-1-1 system and assigned to respond to a "39 Speeding/Racing" call, which was categorized as a "Priority: 2 - Urgent" call. According to Gamez, the dispatch emphasized that several cars were doing donuts and racing in an intersection at Newbury Street and Interstate Highway 35E in Dallas, Texas. After receiving the dispatch, Gamez immediately proceeded to the reported location. He understood calls involving illegal street racing needed to be responded to and disrupted immediately because of the dangers posed to the public and the racers.

Upon arrival, Gamez observed numerous vehicles in the intersection doing donuts and racing. He estimated more than 200 vehicles were at the location. After disrupting the large group of cars gathered in the intersection and clearing that location, he and his partner, Senior Corporal Shelby Nowak, parked on a side street approximately one-eighth of a mile from the original call location. Ten to fifteen minutes later, the suspect vehicle came back and started doing donuts in a parking lot about 200 feet from Gamez's patrol vehicle. Gamez followed the suspect when

he exited the parking lot and began the pursuit with the intent to write the driver a citation. In his deposition, Gamez testified his "objective was to get close enough to turn the lights on to pull him over." He did not immediately activate his vehicle's emergency lights and sirens during the pursuit because he knew from experience that doing so could cause the street racers to flee and/or evade the officers, entice other participants and spectators of the illegal street racing to obstruct the officers' pursuit by blocking the officers' cars in the roadway, and confuse ordinary citizens who might be unable to recognize if the pursuing officer is pulling them over or pursuing another vehicle.

Gamez began this pursuit from a distance, and the suspect immediately began to flee and/or evade Gamez by maneuvering around various vehicles. Gamez responded by maneuvering around several cars in an attempt to get close enough to the vehicle and pull the suspect over. Gamez did not turn on his lights and siren during the quarter-mile pursuit because he "was never behind close enough to turn the lights and sirens [on.]" Gamez intended "to get behind the vehicle" he was trying to pull over, run the license plates, and then turn on his lights and siren "to let the car know that it's being pulled over." Gamez testified that was how he was trained at the DPD academy to conduct a traffic stop.

Gamez caught up to the suspect's vehicle at an intersection where traffic was stopped at a red light. At that point in the pursuit, Gamez was in the far right lane behind Perez's vehicle, and the suspect's vehicle was in the middle lane. A

–3–

bystander's video and Gamez's dash cam video show what happened next. Perez moved her car forward and to the right out of the suspect's path. When the suspect noticed he had a clear path, the suspect accelerated through the intersection, ran the red traffic light, and narrowly avoided colliding with four vehicles. Gamez then maneuvered into the middle lane and rolled forward to assess oncoming traffic. He noticed a semi-truck approaching from the left and immediately engaged his brakes to avoid a collision. The semi-truck collided into the front, driver's side of Gamez's police cruiser and knocked the cruiser into the front-end of Perez's vehicle. Gamez testified he rolled forward after maneuvering into the middle lane to ensure he could safely activate his emergency lights and siren to clear the intersection, but he misjudged the distance in which he rolled and was struck before he had a chance to activate lights and sirens.

Perez filed suit against the City under Chapter 101 of the Texas Tort Claims Act (TTCA) for damages purportedly suffered in the collision by Perez and her children, who were passengers in her vehicle. She pleaded negligence and gross negligence claims and asserted Gamez was in the course and scope of his employment and was acting in furtherance of and engaged in accomplishing work for the City at the time of the collision.

The City filed special exceptions, an original answer, and a plea to the jurisdiction. In the plea to the jurisdiction, the City argued the trial court lacked jurisdiction over Perez's claims against the City because official immunity shielded

–4–

Gamez and the City from liability and negated the TTCA's waiver of immunity. The City further argued the officer's actions satisfied the emergency exception to the TTCA's waiver of immunity because (1) Gamez was responding to an emergency call or "pursuing an actual or suspected violator of the law" at the time of the collision, (2) his actions complied with applicable laws and ordinances, and (3) his actions were not taken with conscious indifference or reckless disregard for the safety of others. *See* TEX. CIV. PRAC. & REM. CODE § 101.055(2) (emergency exception to TTCA's waiver of immunity); see also TEX. TRANSP. CODE §§ 546.001(2), 546.002(b)(1), (2) (operator of an authorized emergency vehicle "may proceed past a red or stop signal or stop sign, after slowing as necessary for safe operation" when the operator is responding to an emergency call or pursuing an actual or suspected violator of the law.). In support of its plea, the City submitted Perez's original petition, Gamez's affidavit, the dash cam video from Gamez's vehicle, and the DPD incident report.

In response to the plea to the jurisdiction, Perez argued the City could not rely on Gamez's claim of official immunity because the City failed to conclusively establish Gamez was performing a discretionary act in good faith that was in the scope of his authority at the time of the incident. Perez also maintained the emergency exception did not apply because Gamez was not responding to an emergency call or reacting to an emergency situation. Finally, Perez asserted the City could not rely on transportation code provisions to support its claim of

–5–

immunity because those provisions apply to questions of fault and not immunity. In support, she presented Gamez's deposition transcript, two pages from the deposition transcript of Officer Nowak, the DPD incident report, and the 2021 revised text of section 301.00 of the DPD's General Orders. Perez also presented the affidavit of Peace Officer Billy Lanier as expert testimony. Lanier is not a DPD officer or employee, was not a witness to the incident at issue, and was not involved in the DPD's investigation of the incident.

The City objected to Lanier's affidavit because he was not timely disclosed as an expert, and the affidavit was fatally deficient. After a hearing, the trial court denied the City's plea to the jurisdiction and overruled its objections to the Lanier affidavit. This interlocutory appeal followed.

## STANDARD OF REVIEW

To invoke the trial court's subject-matter jurisdiction, the plaintiff must allege facts that affirmatively demonstrate the court has jurisdiction to hear the case. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). A plea to the jurisdiction is an appropriate procedural vehicle by which a party may challenge a trial court's subject-matter jurisdiction. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000); *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 639 (Tex. 1999). When a plea to the jurisdiction challenges the existence of jurisdictional facts, the court considers the evidence submitted when resolving the jurisdictional issue. *Miranda*, 133 S.W.3d at 227. "If the evidence creates a fact question regarding the

jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder." *Id.* at 227–28. However, if the evidence related to the jurisdictional issue is undisputed or fails to raise a fact question as to jurisdiction, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228. We review a trial court's ruling on a plea to the jurisdiction de novo. *Id.* As with the summary judgment standard of review, we take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovants favor. *Id.*

## APPLICABLE LAW

Sovereign immunity, governmental immunity, and official immunity are separate but related matters. Sovereign immunity is a common-law doctrine referring to the sovereign's, i.e., the state's, immunity from liability and from suit. *City of Hous. v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011). Sovereign immunity protects the State as well as its "various divisions of state government, including agencies, boards, hospitals, and universities." *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003).

Sovereign immunity also extends to municipalities but is called governmental immunity. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). For cities, however, governmental immunity only applies to actions taken in the performance of their governmental functions, not from actions taken in their proprietary function. *Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006); *City*

*of Plano v. Homoky*, 294 S.W.3d 809, 813 (Tex. App.—Dallas 2009, no pet.). One such governmental function is the provision of police protection. TEX. CIV. PRAC. & REM CODE § 101.0215(a)(1).

The TTCA provides a limited waiver of a municipality's governmental immunity in actions for "property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if" the damages, injuries, and death arose from the operation or use of a motor vehicle and "the employee would be personally liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM CODE § 101.021(1). However, if a governmental employee is entitled to official immunity for his negligence, then the TTCA does not waive immunity as to the employee or his employer. *Univ. of Hous. v. Clark*, 38 S.W.3d 578, 580 (Tex. 2000) ("When official immunity shields a governmental employee from liability, sovereign immunity shields the governmental employer from vicarious liability."); *City of Dallas v. Brooks*, 349 S.W.3d 219, 224 (Tex. App.—Dallas 2011, no pet.) ("If a governmental employee is entitled to official immunity, however, he would not be 'personally liable . . . according to Texas law,' and the statute does not waive the sovereign or governmental immunity of his employer."). "A governmental employee is entitled to official immunity: (1) for the performance of discretionary duties; (2) within the scope of the employee's authority; (3) provided the employee acts in good faith." *Brooks*, 349 S.W.3d at 224 (citing *Clark*, 38 S.W.3d at 580). Official immunity is

an affirmative defense, and the defendant has the burden to establish all its elements. *Clark*, 38 S.W.3d at 580.

There are other exceptions to the waiver of immunity in the TTCA. For example, the emergency exception allows a governmental unit to retain its immunity from "the action of an employee while responding to an emergency call or reacting to an emergency situation if the action is in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law or ordinance, if the action is not taken with conscious indifference or reckless disregard for the safety of others[.]" TEX. CIV. PRAC. & REM. CODE § 101.055(2). When the exception applies, immunity is reinstated and the courts construe the TTCA "strictly on the side of preserving immunity." *See Guillen v. City of San Antonio*, 13 S.W.3d 428, 433 (Tex. App.—San Antonio 2000, pet. denied).

## ANALYSIS

On appeal, the City maintains it is immune from suit based on Gamez's official immunity and the emergency exception to the waiver of immunity under the TTCA. The City also contends the trial court abused its discretion by overruling the City's objections to the affidavit of Perez's expert, Peace Officer Billy Lanier. We conclude the City conclusively established Gamez's official immunity because (1) his actions were discretionary as a matter of law, (2) Perez did not present sufficient evidence to raise a genuine issue of material fact as to whether Gamez acted in good faith, and (3) Gamez conclusively established he was acting within the

scope of his authority. The City's plea to the jurisdiction, therefore, should have been granted and Perez's claims dismissed for want of jurisdiction.

## I. Official Immunity

"Government employees are entitled to official immunity from suit arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority." *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994). The City asserts it conclusively proved each element of Gamez's official immunity affirmative defense, thus preserving its immunity from suit. We consider each element of official immunity in light of the parties' arguments and evidence.

### A. Discretionary Duties

We must first determine if the City conclusively established Gamez was performing a discretionary act while operating his patrol car at the time of the incident. *See Chambers*, 883 S.W.2d at 653-54 (distinguishing discretionary acts from ministerial acts). An action is discretionary if it involves personal deliberation, decision, and judgment; an action that requires obedience to orders or the performance of a duty as to which the employee has no choice is ministerial. *Ramos v. Tex. Dep't of Pub. Safety*, 35 S.W.3d 723, 727 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (citing *Chambers*, 883 S.W.2d at 654); *Kassen v. Hatley*, 887 S.W.2d 4, 9 (Tex. 1994) ("Ministerial acts are those '[w]here the law prescribes and defines the duties to be performed with such precision and certainty as to leave

–10–

nothing to the exercise of discretion or judgment.'") (quoting *Chambers*, 883 S.W.2d at 654)).

The distinction between ministerial and discretionary acts is often one of degree because any official act that is ministerial still requires the employee to use some discretion in its performance. *Chambers*, 883 S.W.2d at 654. For example, an officer driving a motor vehicle while on official, non-emergency business is performing a ministerial act. *E.g., Hulick v. City of Houston*, No. 14-20-00424-CV, 2022 WL 288096, (Tex. App.—Houston [14th Dist.] Feb. 1, 2022, pet. denied) (mem. op., not designated for publication) (officer searching for suspect was engaged in a ministerial act); *Woods v. Moody*, 933 S.W.2d 306, 308 (Tex. App.—Houston [14th Dist.] 1996, no writ) (deputy sheriff who was on duty and en route to Harris County business when accident occurred was engaged in ministerial act).

In contrast, an officer's operation of a motor vehicle sometimes "involves personal deliberation or the exercise of professional expertise, decision, or judgment." *Brooks*, 349 S.W.3d at 225. Examples of an officer's discretionary activities include high-speed chases, traffic stops, and the decision to violate traffic laws to quickly reach the scene of suspected criminal activity or to assist another officer. *See, e.g.*, *Chambers*, 883 S.W.2d at 655 (engaging in high-speed chase was discretionary act); *Webb County v. Lino*, No. 04-19-00891-CV, 2020 WL 4218714, at *5 (Tex. App.—San Antonio July 22, 2020, no pet.) (mem. op.) (initiating routine traffic stop was discretionary act); *Brooks*, 349 S.W.3d at 226–27 (responding at

high rate of speed to call for back-up involving combative and suicidal person was discretionary act); *Collins v. City of Hous.*, No. 14-13-00533-CV, 2014 WL 3051231, at *5 (Tex. App.—Houston [14th Dist.] July 3, 2014, no pet.) (mem. op.) (responding quickly to call for assistance to apprehend reckless motorist was discretionary act); *City of Hous. v. Hatton*, No. 01-11-01068-CV, 2012 WL 3528003, at *3 (Tex. App.—Houston [1st Dist.] Aug. 16, 2012, pet. denied) (responding to "Priority One" call for assistance and using emergency lights and sirens was discretionary act when accident occurred); *Harless v. Niles*, 100 S.W.3d 390, 397–98 (Tex. App.—San Antonio 2002, no pet.) (officer's decision to violate traffic laws to quickly reach scene of suspected criminal activity and assist another officer was discretionary act).

In determining whether an act is discretionary, we focus on whether an employee was performing a discretionary function—not on whether the employee had the discretion to do an allegedly wrongful act while discharging that function, or whether the job description at issue includes discretionary duties. *Chambers*, 883 S.W.2d at 653. Here, the City maintains Gamez was performing discretionary functions because he was a police officer operating a police cruiser while pursuing a suspect and attempting to conduct a traffic stop. The City relied on Gamez's affidavit, in which he stated he was dispatched through the 9-1-1 system and was assigned to respond to a "39 Speeding/Racing" categorized as a "Priority: 2 -Urgent" call. He immediately responded to the call and disrupted a large group of cars

gathered in the intersection. Gamez then decided to pursue a vehicle he identified as a participant in illegal street racing with the intent to issue the driver a citation. Gamez further explained why the pursuit was urgent:

> Due to my law enforcement training and my experience in responding to emergency and non-emergency calls, I understand that calls involving illegal street racing need to be responded to and disrupted immediately because of the dangers posed to the public and racers themselves.

Gamez also stated why he chose to assess the intersection's traffic just prior to the collision:

> I assessed the need for me to get to the [sic] apprehend the fleeing illegal street racing suspect against the minimal risk of an accident and determined that the potential danger posed by my rolling forward to assess the intersection's traffic and to then engage my lights and sirens to clear the intersection was far less than the potential danger posed by the potential car collisions that could occur as a result of the suspect's actions. Given that I had been dispatched through the 9-1-1 system to respond and was expected to respond urgently and disrupt the cars doing donuts and racing in the intersection, there was no other reasonable alternative but to attempt to pursue the suspect in the manner in which I did. I believed that way to be the most direct, fastest, and efficient route to protect the public.

Although Perez "candidly recognizes that the decision to pursue a suspect is *typically* a discretionary act," she contends Gamez's acts were ministerial because Gamez testified in his deposition that his pursuit was not an emergency situation. In his deposition, Gamez agreed with Perez's counsel that "there was no emergency," and he "wasn't going to an emergency." And when asked "if you would have perceived an emergency, you would've flipped your emergency lights and sirens immediately, right?" Gamez responded, "If it's an emergency, yes." This testimony does not raise

–13–

an issue of material fact as to whether Gamez was performing a discretionary function, however, because an officer may perform a discretionary act while driving even in circumstances that do not rise to the level of an emergency. *See*, *e.g.*, *Ramos*, 35 S.W.3d at 727 (officer performed a discretionary act by conducting a driving test because he exercised judgment regarding how and when to conduct the test).

Gamez testified in his affidavit and deposition that, at the time of the accident, he was pursuing a suspect with the intent to pull him over and give him a citation for illegal street racing. Gamez explained in his deposition that "a traffic stop is not considered an emergency" but officers activate their lights for a traffic stop once the officer is close enough to the suspect for the suspect to recognize the officer is pulling the suspect over. He also stated he intended to activate his lights and siren after "clearing" the intersection but was hit by the semi-truck before he could do so. By "clearing," Gamez meant "we look left, look right and then proceed to go forward." Further, Gamez consistently testified he believed the need to conduct a traffic stop and cite the suspect for illegal street racing outweighed any potential risk of harm to others.

An action is discretionary if it involves personal deliberation, decision, and judgment. *Ramos*, 35 S.W.3d at 727 (citing *Chambers*, 883 S.W.2d at 654). Gamez's testimony conclusively established his actions involved personal deliberation, decision and judgment and were, therefore discretionary. Gamez's statements that

–14–

he was not responding to an emergency or did not consider a traffic stop an emergency does not alter the discretionary nature of his actions.

The case relied upon by Perez, *Hulick v. City of Houston*, is distinguishable because that case did not involve a suspect pursuit or an emergency dispatch. No. 14-20-00424-CV, 2022 WL 288096, (Tex. App.—Houston [14th Dist.] Feb. 1, 2022, pet. denied) (mem. op.). Rather, the collision occurred when an officer was searching for a suspect alleged to have caused a disturbance outside of a business. *Id.* at *4. The *Hulick* court acknowledged that a law enforcement officer's operation of a vehicle is a discretionary function in cases involving "high-speed chases, traffic stops, responding quickly to an officer's call for assistance, or responding to an emergency." *Id.* at *3. The court distinguished the officer's actions at issue from those discretionary functions, however, because "there is no evidence of an emergency or any urgent circumstance." *Id.* at *4. The court concluded the officer's search for a suspect was ministerial rather than discretionary because the search constituted official, non-emergency business. *Id.* at *3, 4. Here, in contrast, Gamez was engaged in a suspect pursuit to conduct a traffic stop. These were discretionary functions as a matter of law regardless of whether Gamez believed there was an emergency.

Perez next argues Gamez's acts were ministerial because they did not comply with DPD General Order 301. Perez relies on DPD General Orders 301.03,

–15–

301.07(B), and 301.07(E)(1)–(2) in support. DPD General Order 301.03 is titled

"Levels of Response Defined" and provides for two levels of responses:

> A. Code 1—The operation of an emergency vehicle in normal traffic without using emergency lights and siren. All departmental personnel operating emergency vehicles in this mode *will proceed with the normal traffic flow and obey all traffic control devices and signals*.

> B. Code 3—The operation of an emergency vehicle using the emergency warning devices, as well as activating the emergency vehicle's headlights. This method of operation is authorized by the State Transportation Code and is outlined in general order 301.05.

DPD GEN. ORD. 301.03(A)–(B). (emphasis added). When operating a vehicle Code

3, officers "shall come to a complete stop to ensure an intersection is clear prior to

disregarding any stop signal or stop sign." DPD GEN. ORD. 301.03(B)(2). But an

officer involved in an authorized pursuit is not bound by 301.03(B)(2). DPD GEN.

ORD. 301.03(B)(3)(c).

General Order 301.07 is titled Vehicle Pursuits. The purpose of the vehicle

pursuit policy "is to establish guidelines for making decisions with regard to

vehicular pursuits." DPD GEN. ORD. 301.07(A). Subsection B provides "the decision

to initiate a pursuit must be based on the pursuing officer's conclusion that the

immediate danger to the officer, public and suspect created by the pursuit is less than

the immediate or potential danger to the public should the suspect remain at large."

DPD GEN. ORD. 301.07(B). Further, while operating Code 3 during a pursuit, "the

emergency warning lights, siren, and emergency vehicle headlights will be used at

all times[.]" DPD GEN. ORD. 301.07(E)(1).

–16–

Perez contends the pursuit was not authorized because the City failed to show Gamez concluded an immediate danger to the public was outweighed by his pursuit to issue a traffic citation, and he was required to use lights and sirens but failed to do so. She argues that, as a result, Gamez had no authority to make the decision to go through the stop light to pursue the suspect. We disagree.

At this point in the analysis, our focus is on whether Gamez was performing a discretionary function, not on whether he had "discretion to do an allegedly wrongful act while discharging that function." *See Brooks*, 349 S.W.3d at 226–27 (first quoting *Chambers*, 883 S.W.2d at 653; and then citing *Harless*, 100 S.W.3d at 396). The proper inquiry is whether Gamez was operating his patrol car in an emergency situation, not how or in what manner he operated his vehicle while responding. *See Brooks*, 349 S.W.3d at 226–27; *see also Harless*, 100 S.W.3d at 397. The evidence here established Gamez was on-duty, assigned to the illegal street racing task force, and assigned by dispatch to respond to a "39 Speeding/Racing" call, which was categorized as a "Priority: 2 - Urgent" call. After clearing a large group of vehicles at the dispatched location, Gamez saw the suspect's vehicle doing donuts and made the decision to pursue the suspect and conduct a traffic stop. Based on his training and experience, Gamez also decided not to immediately engage his lights and siren. Those decisions fundamentally involved Gamez's discretion. *See Chambers*, 883 S.W.2d at 655 ("The decision to pursue a particular suspect will fundamentally involve the officer's discretion, because the officer must, in the first

instance, elect whether to undertake pursuit. Beyond the initial decision to engage in the chase, a high speed pursuit involves the officer's discretion on a number of levels, including, which route should be followed, at what speed, should back-up be called for, and how closely should the fleeing vehicle be pursued.").

We conclude the circumstances here are analogous to those in *Chambers* and its progeny in which courts routinely conclude an officer's decision to engage in a pursuit or perform a traffic stop involve an officer's discretion. Accordingly, we hold Gamez was performing a discretionary function when he pursued the suspect vehicle with the intent to conduct a traffic stop. As such, the City established the first element of official immunity.

## B.      Good Faith

We must next determine if the City conclusively established the element of good faith.

### 1.      Applicable law

In determining official immunity, a court measures good faith under a standard of objective reasonableness without regard to the officer's subjective state of mind. *Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997); *Chambers*, 883 S.W.2d at 656. In the context of a high-speed pursuit case, an officer acts in good faith if "a reasonably prudent officer, under the same or similar circumstances, could have believed that the need to immediately apprehend the suspect outweighed a clear risk of harm to the public in continuing the pursuit." *Chambers*, 883 S.W.2d

at 656. The supreme court's opinion in *Chambers*, which involved a high-speed police pursuit, described this test as setting "an elevated standard of proof for the nonmovant seeking to defeat a claim of official immunity in response to a motion for summary judgment, while reasonably accommodating the competing interests involved." *Id.*

The *Chambers* court observed the "could have believed" component of good faith means that

> an officer must prove that a reasonably prudent officer might have believed that the pursuit should have been continued. It does not mean that an officer has to prove that it would have been unreasonable to stop the pursuit; nor must the officer prove that all reasonably prudent officers would have continued the pursuit. To controvert the officer's summary judgment proof on good faith, the plaintiff must do more than show that a reasonably prudent officer could have decided to stop the pursuit; *the plaintiff must show that "no reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts*."

*Id.* at 656–57 (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir.1993) (emphasis added) (citations and footnotes omitted)).

The good-faith test requires a balancing of two competing considerations: the need of the action taken weighed against the clear risk of harm to the public in taking the action. *Wadewitz*, 951 S.W.2d at 467. *Wadewitz* involved a high-speed response to assist an officer on a theft in progress. *Id.* In that context, the supreme court stated that "need"

> is determined by factors such as the seriousness of the crime or accident to which the officer responds, whether the officer's immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect,

and what alternative courses of action, if any, are available to achieve a comparable result.

*Id.* On the other hand, the "risk" aspect of good faith

refers to the countervailing public safety concerns: the nature and severity of harm that the officer's actions could cause (including injuries to bystanders as well as the possibility that an accident would prevent the officer from reaching the scene of the emergency), the likelihood that any harm would occur, and whether any risk of harm would be clear to a reasonably prudent officer.

*Id.* To conclusively establish official immunity, the government's evidence must address both the "need" and "risk" elements. *Id.* (affirming denial of employee's motion for summary judgment on defense of official immunity because employee's summary judgment proof did not address risk element).

How a movant can prove the need and risk factors is well-established. A police officer's own affidavit may establish good faith. *City of Dall. v. Rodriguez*, No. 05-19-00045-CV, 2020 WL 1486831, at *6 (Tex. App.—Dallas Mar. 27, 2020, no pet.) (mem. op.); *City of La Joya v. Herr*, 41 S.W.3d 755, 761 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.). "Evidence of an officer's good faith must be substantiated with facts showing the officer assessed both the need to apprehend the suspect and the risk of harm to the public." *Tex. Dep't of Pub. Safety v. Bonilla*, 481 S.W.3d 640, 644 (Tex. 2015). "Magic words are not required to establish that a law-enforcement officer considered the need/risk balancing factors." *Id.* at 645. Further, "conclusory statements that a reasonable officer could or could not have taken some action will neither establish good faith on summary judgment nor raise a fact issue

–20–

to defeat summary judgment." *Clark*, 38 S.W.3d at 581. An expert's opinion testimony may establish good faith, even if the expert is an interested witness, as long as the testimony is more than mere conclusory statements. *Brooks*, 349 S.W.3d at 229 (citing *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999)).

Evidence of negligence alone will not controvert competent evidence of good faith. *See Wadewitz*, 951 S.W.2d at 467 n. 1. Similarly, an officer's good faith is not rebutted by evidence that he violated department policy. *City of Dall. v. Ross*, No. 05-21-00001-CV, 2021 WL 4304478, at *3–4 (Tex. App.—Dallas Sept. 22, 2021, no pet.) (mem. op.) (citing *Rodriguez*, 2020 WL 1486831, at *6). Moreover, "[t]he mere fact that an accident occurred is not evidence" the officer did not act in good faith. *Ross*, 2021 WL 4304478, at *5.

### 2. The City's evidence

To prove Gamez acted in good faith, the City had to prove a reasonably prudent officer, under the same or similar circumstances, could have believed the need to pursue the suspect vehicle in the manner in which Gamez responded outweighed a clear risk of harm to the public in doing so. *See Wadewitz*, 951 S.W.2d at 466 (citing *Chambers*, 883 S.W.2d at 656); *see also Brooks*, 349 S.W.3d at 228–29 (applying good-faith test to the context of the facts of the case). The City was not required to prove it would have been unreasonable to take a different action or that all reasonably prudent police officers would have made the same decisions. *See Chambers*, 883 S.W.2d at 657; *see also Brooks*, 349 S.W.3d at 229. For example, in

*Bonilla*, the court concluded DPS's evidence was sufficient to establish good faith even though it did not explicitly address alternatives to pursuit:

> DPS's summary-judgment evidence detailed the specific circumstances giving rise to pursuit and emphasized the potential danger to the public due to the subject vehicle's erratic and unsafe activity. Although not explicitly addressing alternatives to pursuit, the trooper implicitly discounted the viability of other alternatives based on his stated belief that immediate action was necessary and his inability to identify the driver at that time. The fact that the trooper did not expressly identify "alternatives" that may have been considered does not render the evidence deficient. The court of appeals erred in holding otherwise.

*Bonilla*, 481 S.W.3d at 645.

"The need element refers to the 'urgency of the circumstances requiring police intervention,' or 'the seriousness of the crime or accident to which the officer responds, whether the officer's immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect, and what alternative courses of action, if any, are available to achieve a comparable result.'" *Clark*, 38 S.W.3d at 581 (quoting *Wadewitz*, 951 S.W.2d at 467). The risk element of good faith refers to "the countervailing public safety concerns," or "the nature and severity of harm that the officer's actions could cause (including injuries to bystanders as well as the possibility that an accident would prevent the officer from reaching the scene of the emergency), the likelihood that any harm would occur, and whether any risk of harm would be clear to a reasonably prudent officer." *Id.* (quoting *Wadewitz*, 951 S.W.2d at 467).

In his affidavit, Gamez addressed both the "need" and "risk" aspects of good faith and his balancing of those issues, and stated he believed his immediate intervention was necessary to prevent bodily injury to the suspect and the public. Gamez testified he in good faith believed the need to apprehend the fleeing suspect outweighed the perceived minimal risk of an accident. Gamez also believed there was little to no risk in rolling forward to assess the traffic at the intersection because he had no intent to blindly enter the intersection. Rather, he intended to "clear" the intersection and did not anticipate misjudging the distance in which he rolled into the intersection. Gamez assessed the need to get to and apprehend the fleeing suspect against the minimal risk of an accident. In doing so, he determined the potential danger posed by rolling forward to assess the intersection's traffic before engaging lights and sirens was far less than the potential danger posed by the suspect's actions.

Further, Gamez testified that pursuing the suspect as he did was "the most direct, fastest, and efficient route to protect the public" and the only reasonable response to the dispatched call:

> Given that I had been dispatched through the 9-1-1 system to respond and was expected to respond urgently and disrupt the cars doing donuts and racing in the intersection, there was no other reasonable alternative but to attempt to pursue the suspect in the manner in which I did.

From Gamez's point of view at the time, and at all times while pursuing the fleeing suspect, he did not engage in conduct he believed would pose a likelihood of serious injury to anyone. Gamez testified he was acting in good faith and within the scope of his discretionary authority as a police officer, and made no decisions based on any

–23–

information he believed to be incorrect or incomplete. Gamez believed his actions were reasonable in light of the circumstances and any reasonably prudent police officer, under the same or similar circumstances, could have believed his actions were justified.

Gamez's affidavit shows he considered the *Wadewitz* need and risk factors and supports his claim that a reasonably prudent officer could have assessed risk and need as he did. *See Clark*, 38 S.W.3d at 587. We conclude the City met its burden to present evidence that a reasonably prudent officer, under the same or similar circumstances, could have believed that the actions Gamez took were justified. *See Chambers*, 883 S.W.2d at 656–57; *see also Brooks*, 394 S.W.3d at 230. We next address whether Perez controverted that proof.

### 3. Perez's evidence

To controvert the City's proof Gamez acted in good faith, Perez had to present evidence "that no reasonable person in [Gamez's] position could have thought the facts were such that they justified [Gamez's] acts." *See Chambers*, 883 S.W.2d at 657. Perez contends Gamez's deposition testimony, the Lanier affidavit, and DPD General Order 301.07 provide the required controverting evidence.

First, Perez relies on statements made by Gamez in his deposition that he was not responding to an emergency," and he did not know if the semi-truck was in the middle lane or right lane when the collision occurred. She contends those statements show "that reasonable people could differ in their conclusions about Officer

–24–

Gamez's testimony that he was acting in good faith when he pulled all the way into an intersection to assess traffic, without engaging his lights and sirens, when it was a non-emergency situation." She also cites Gamez's admission that he wrecked a police vehicle two years before this incident and was found at fault by the DPD. In that incident, Perez backed into a car as he was clearing an intersection of vehicles involved in street racing. His lights and sirens were not on. Perez maintains the prior wreck raises a fact question as to what Gamez "should have perceived about the danger to others by failing to engage lights and sirens when in pursuit, and undercuts his contention that that he acted in good faith in attempting to proceed through an intersection on a red light without lights and sirens." Although this evidence may be relevant in determining negligence, evidence of negligence alone is insufficient to controvert competent evidence of good faith. *Brooks*, 349 S.W.3d at 231–32. "The good faith standard is not equivalent to a general negligence test, which addresses what a reasonable person *would have done*, rather than what a reasonable officer *could have believed*." *Wadewitz*, 951 S.W.2d at 467, n. 1. As noted earlier, to controvert the City's proof that Gamez acted in good faith, Perez had to prove "no reasonable person in [Gamez's] position could have thought the facts were such that they justified [Gamez's] acts." *See Chambers*, 883 S.W.2d at 657; *Brooks*, 349 S.W.3d at 231–32. The evidence cited by Perez does not lead to—or even speak on—that conclusion. That evidence, thus, did not raise a fact issue to controvert the City's evidence of good faith.

Next, Perez cites paragraph nine of Peace Officer Billy Lanier's affidavit as evidence raising a fact issue on good faith:

9. Officer Gamez was not acting in good faith when he pursed [sic] the suspect through the stop light because no reasonable officer could have believed under the circumstances, as Officer Gamez perceived the [sic] at that time, that the need to immediately apprehend the suspect outweighed a clear risk of harm to the public in continuing the pursuit. Further, there was heavy traffic in and around this intersection, and any reasonable peace officer would have assessed the situation and determined that the need to run the red light, even if it was to investigate another vehicle, was substantially outweighed by the risks of causing a crash resulting in bodily injury to occupants of a vehicle or pedestrians. The risks of what this peace officer did were substantially outweighed by the probability of a crash that would result in injury to bystanders given the traffic conditions, the traffic that had the right-of-way to him, and the probability that this would result in an injury-causing crash. Pulling over a car that had pulled into an intersection on a red light by running a red light was negligent, and the alternative the officer had was to observe and proceed through the intersection when the light turned green, pulling over the car in a safe place. This would have resulted in a comparable result. This officer's immediate presence in that intersection against traffic that had the right-of-way was not necessary to save a life or save someone from injury. That is because he could see that his following of the suspect was making the suspect drive in a risky manner to avoid detention. Under DPD General order 301.07 (Vehicle Pursuits), Officer Gamez had no authority to make the decision to go through the stop light to pursue the individual he was trying to pull over. Although disrupting street racing or a gathering where "donuts" are being driven in the street, is a priority, this had already been disrupted when the officer engaged in pursuit. Pursuing a suspect beyond immediate disruption of the event required a different weighing of the risks and benefits.

Lanier also asserted his opinions that Gamez was not responding to an emergency situation, the decision to run the red light was "against all policies and procedures on driving safety of a law enforcement vehicle," Gamez was negligent, and his actions "constituted reckless and careless operation" of a police vehicle. Lanier's

–26–

testimony is legally insufficient to controvert the City's proof of good faith because the testimony consists only of his conclusory statements and opinions.

For example, Lanier's statement that "no reasonable officer could have believed" the need to apprehend the suspect outweighed the risks of continuing the pursuit is insufficient as a matter of law to raise a fact issue on good faith to defeat the City's plea to the jurisdiction. *See Clark*, 38 S.W.3d at 581 ("conclusory statements that a reasonable officer could or could not have taken some action will neither establish good faith on summary judgment nor raise a fact issue to defeat summary judgment"); *see also Brooks*, 349 S.W.3d at 229 (an expert's opinion testimony may establish good faith only if the testimony is more than mere conclusory statements) (citing *Burrow*, 997 S.W.2d at 235). The Texas Supreme Court has found similar "expert" testimony insufficient to controvert a defendant's proof on good faith. *See City of Houston v. Sauls*, 690 S.W.3d 60 (Tex. 2024); *see also Clark*, 38 S.W.3d at 587.

In *Sauls*, the plaintiff's expert opined that "no reasonable person in the officer's position could have thought the facts were such that they justified driving at the excessive speeds, with known poor vision, and at the same time failing to keep a proper lookout or line of site, while ignoring the safer and more reasonable alternatives." 690 S.W.3d at 78. The *Sauls* court held the expert's opinion "is conclusory, as his discussion of the facts and circumstances of each aspect of the need–risk balancing test fails to adequately substantiate his conclusion and satisfy

–27–

the elevated standard of proof for controverting good faith." *Id.* (first citing *Clark*, 38 S.W.3d at 587; and then citing *Wadewitz*, 951 S.W.2d at 466 ("Conclusory statements by an expert are insufficient to support or defeat summary judgment.")).

The Court further concluded the expert's opinion "[a]t most" raised a fact issue regarding the officer's negligence "or that a reasonably prudent officer could have made a different decision." *Sauls*, 690 S.W.3d at 80. The Court reiterated "evidence of negligence alone is not enough to controvert proof of good faith," and the "elevated standard of proof" set out in *Chambers* "requires a plaintiff to show that no reasonable officer in the same or similar circumstances could have thought the facts were such that they justified the acts at issue." *Id.* (citing *Chambers*, 883 S.W.2d at 656–57). In *Sauls*, the expert affidavit "did not substantiate such a conclusion" and failed to controvert the City's proof of good faith. *Id.*

The Court reached the same result in *Clark*. There, as here, the plaintiff presented the conclusory affidavit of an expert to controvert the defendant's evidence of good faith. *Clark*, 38 S.W.3d at 587. Specifically, Clark submitted the affidavit of expert Richard H. Turner, the chief executive officer of the National Academy for Professional Driving. *Id.* Turner stated the officers were not acting in good faith and "another reasonably prudent law enforcement officer, under the same or similar circumstances, could not have believed the need to immediately apprehend [the suspect] outweighed a clear risk of harm to other members of the public who may be using the highway during the pursuit." *Id.* He also stated the officers' actions

–28–

"did not meet industry standards for the University of Houston, City of Houston, Harris County, State of Texas, or the United States of America" and "violated the University of Houston policies regarding pursuit." *Id.* Turner based his opinion on his review of "facts surrounding the pursuit," "numerous documents including, but not limited to depositions taken, and policies and procedures presented in the discovery process," and his visit to the pursuit scene. *Id.* The *Clark* court held the Turner affidavit insufficient to controvert the evidence of good faith:

> Because Turner's testimony on good faith is not substantiated with reference to each aspect of the need and risk balancing test, it is conclusory and is insufficient to controvert the defendant's proof on good faith.

*Id.* (citing *Wadewitz*, 951 S.W.2d at 467). The Court then held the officers established good faith as a matter of law. *Id.*

*Sauls* and *Clark* apply equally here. Lanier's affidavit testimony on good faith, like the experts' testimony in *Sauls* and *Clark*, is not substantiated with reference to each aspect of the need and risk balancing test, is conclusory, and is, at most, sufficient to raise a fact issue on negligence. But the testimony is insufficient to controvert the City's proof of good faith. *See Sauls*, 690 S.W.3d at 80; *see also Clark*, 38 S.W.3d at 587; *City of San Antonio v. Trevino*, 217 S.W.3d 591, 596 (Tex. App.—San Antonio 2006, no pet.) (expert's conclusory testimony that officer failed to exercise due care for citizens and failed to warn the public was not substantiated with reference to each aspect of the need and risk balancing test and, therefore, did not controvert the City's evidence of good faith); *City of Richmond v. Rodriguez*,

–29–

No. 01-08-00471-CV, 2009 WL 884810, at *5–6 (Tex. App.—Houston [1st Dist.] Apr. 2, 2009, no pet.) (mem. op.) (testimony that did not address the need and risk factors in *Wadewitz* was insufficient to controvert proof on good faith).

Lanier's opinion that DPD General Order 301.07 gave Gamez no discretion to go through the stop light to perform a traffic stop is equally insufficient to create a fact issue on good faith. By its own terms, the purpose of DPD General Order 301.07 "is to establish guidelines for making decisions with regard to vehicle pursuits." DPD GEN. ORDER 310.07(A). Further, as we noted in *Brooks*, the DPD General Orders state they are "intended as a broad guide" to the application of the City's procedures for operating emergency vehicles, including police cars, and "do not speak in terms of either the 'needs' or the 'risks' that must be balanced in determining whether an officer is acting in good faith in order to be protected from liability by official immunity." *Brooks*, 349 S.W.3d at 232. Moreover, an officer's good faith is not rebutted by evidence that he violated department policy, and "[t]he mere fact that an accident occurred is not evidence" the officer did not act in good faith. *Ross*, 2021 WL 4304478, at *3–4, 5; *Rodriguez*, 2020 WL 1486831, at *6. Although Lanier's testimony asserting Gamez violated the DPD General Orders may be relevant as to whether Gamez was negligent, it falls short of constituting evidence that no reasonable officer in Gamez's position could have thought the facts were such that they justified Gamez's actions. *See id.* at 233.

Under this record, we conclude Gamez established that a reasonably prudent officer could have responded as he did here. The evidence presented by Perez did not raise a fact issue on good faith. Accordingly, Gamez conclusively established the element of good faith.

### C.    Acting within the scope of his authority

Finally, Perez argues the City did not prove Gamez was acting within the scope of his authority. She cites no authorities and presents no arguments in support. The City maintains Gamez was acting within the scope of his authority because he was dispatched to respond to a "39 Speed/Racing" categorized as a "Priority:2 – Urgent" call while on-duty as a DPD patrol officer and his decision to pursue a fleeing suspect with the intent to conduct a traffic stop was part of his job duties while on patrol. We agree with the City.

"A government employee acts within the scope of his authority if he is discharging the duties generally assigned to him, even if his actions may have been wrong or negligent." *Brooks*, 349 S.W.3d at 227 (citing *Chambers*, 883 S.W.2d at 658). Here, the evidence was undisputed Gamez was on duty as a DPD patrol officer and was pursuing a fleeing suspect with the intent to conduct a traffic stop at the time of the collision. The pursuit and the intended traffic stop are part of Gamez's job duties. He was, therefore, discharging duties generally assigned to him. *See Brooks*, 349 S.W.3d at 227 (officer was discharging the duties generally assigned to him by responding to a call for backup). We conclude the evidence proved as a

–31–

matter of law that Gamez was acting within the scope of his authority when he pursued the suspect vehicle here. *See id.* Accordingly, the City has conclusively established the final element of Gamez's official immunity defense that Gamez was acting within the scope of his authority at the time of the incident.

## II. Remaining Issues

The City also contends its plea to the jurisdiction should have been granted based on the emergency exception to the TTCA's immunity waiver. The City further challenges the trial court's order overruling the City's objections to the affidavit testimony of Lanier. Because our conclusion regarding the City's official immunity is dispositive, we do not reach the City's remaining issues. TEX. R. APP. P. 47.1.

## CONCLUSION

We conclude the City conclusively proved each element of Gamez's official immunity affirmative defense, and thus proved its governmental immunity from suit. Accordingly, we reverse the trial court's order denying the City's plea to the jurisdiction and render judgment dismissing appellees' claims against the City for want of jurisdiction.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

230376F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CITY OF DALLAS, Appellant

No. 05-23-00376-CV      V.

BRANDIE PEREZ,
INDIVIDUALLY AND AS NEXT
FRIEND TO A.P., G.P. AND S.P.,
MINORS, Appellees

On Appeal from the County Court at
Law No. 4, Dallas County, Texas
Trial Court Cause No. CC-22-02375-
D.
Opinion delivered by Justice Partida-
Kipness. Justices Pedersen, III and
Garcia participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** dismissing Appellees' claims against the City of Dallas for want of jurisdiction.

It is **ORDERED** that appellant CITY OF DALLAS recover its costs of this appeal from appellees BRANDIE PEREZ, INDIVIDUALLY AND AS NEXT FRIEND TO A.P., G.P. AND S.P., MINORS.

Judgment entered this 31st day of July 2024.